Barney QUILTER, et al., Plaintiffs,

v.

George V. VOINOVICH,
et al., Defendants.

No. 5:91 CV 2219.

United States District Court,
N.D. Ohio,
Eastern Division.

Aug. 11, 1995.

Jack Gregg Haught, Andrew S. Bergman, Office Of The Attorney General, Columbus, OH, party in interest.

Lawrence A. Kane, Jr., Dinsmore & Shohl, Cincinnati, OH, special master.

Armistead W. Gilliam, Jr., Ann Wightman, Faruki, Gilliam & Ireland, Dayton, OH, for intervenors-plaintiffs.

Before JONES and CELEBREZZE, Circuit Judges, and DOWD, District Judge.

PER CURIAM.

## OPINION

The question before this court is whether the Ohio Apportionment Board's consideration of race in its 1992 redistricting plan violated the Equal Protection Clause of the Fourteenth Amendment. We hold that by virtue of demonstrated white and African American coalitional voting for legislative seats in Ohio, and the failure of Defendants to demonstrate a compelling state interest for using race as the predominant factor in drawing legislative lines, certain districts in the 1992 plan are unconstitutional.

### I. Background and Procedural History

Pursuant to the Ohio Constitution, the State Apportionment Board, comprised of five members, must reapportion State House and Senate electoral districts for the state legislature every ten years.[1] Following the 1990 federal census, a majority of the Apportionment Board[2] appointed James R. Tilling to draft an apportionment plan on behalf of the Board. After conducting public hearings throughout the state, including meeting with some members of minority organizations, Tilling drafted a plan that included eight majority-minority districts, districts in which

Timothy F. Scanlon, Scanlon & Gearinger, Akron, OH, Armistead W. Gilliam, Jr., Ann Wightman, Laura A. Sanom, Faruki, Gilliam & Ireland, Dayton, OH, for plaintiffs.

Orla Ellis Collier, III, Norton Victor Goodman, James F. DeLeone, Mark D. Tucker, Benesch, Friedlander, Coplan & Aronoff, Columbus, OH, Charles M. Rosenberg, Maynard A. Buck, III, Jeremy Gilman, Benesch, Friedlander, Coplan & Aronoff, Cleveland, OH, for defendants.

1. Article XI, Section 1 of the Constitution of the State of Ohio provides:

 The governor, auditor of state, secretary of state, one person chosen by the speaker of the house of representatives and the leader in the senate of the political party of which the speaker is a member, and one person chosen by the legislative leaders in the two houses of the major political party of which the speaker is not a member shall be the persons responsible for the apportionment of this state for members of the general assembly.

 Such persons, or a majority of their number, shall meet and establish in the manner prescribed in this Article the boundaries for each

 of ninety-nine house of representatives districts and thirty-three senate districts. Such meeting shall convene on a date designated by the governor between August 1 and October 1 in the year [1971] and every tenth year thereafter. Ohio Const., art. XI, § 1.

2. The majority consisted of Defendants George V. Voinovich, Governor of the State of Ohio, Stanley J. Aronoff, President of the Ohio Senate, and Robert A. Taft, II, Secretary of State of Ohio. In the minority were Plaintiffs Barney Quilter, Speaker Pro Tempore of the Ohio House of Representatives, and Thomas E. Ferguson, Auditor of the State of Ohio.

a majority of the population is a member of a specific minority group. *Voinovich v. Quilter,* 507 U.S. 146, 148, 113 S.Ct. 1149, 1153, 122 L.Ed.2d 500 (1993). On October 1, 1991, the Apportionment Board adopted the plan Tilling submitted by a 3–2 vote along party lines. *Id.* The three Republican members voted for the plan, and the two Democrats voted against it. The Board later reconvened on October 3, 1991, to make several technical amendments to the plan, and the plan, adopted on October 3, 1991, in the wake of these changes, was designated "Amendment C."

On November 1, 1991, Barney Quilter and Thomas Ferguson, the two Democrats on the Board who voted against the plan, and various Democratic party officials and legislators filed suit against the Republican members of the Apportionment Board and Tilling.[3] Seeking invalidation of the plan, the Plaintiffs alleged that the redistricting plan violated section 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973, the Fourteenth and Fifteenth Amendments to the United States Constitution, and Article XI of the Ohio Constitution, which provided specific apportionment guidelines. *Quilter v. Voinovich,* 794 F.Supp. 695, 695–96 (N.D.Ohio 1992). According to the Plaintiffs, the Defendants intentionally "packed minorities into certain districts where minorities historically were able to elect representatives of choice with crossover votes." *Id.* at 698. The Plaintiffs contended that this packing resulted in a waste of minority votes in the packed districts and a dilution of minority voting strength in the surrounding areas where the "packed" voters could influence elections. *Id.* In response, the Defendants contended that the plan actually enhanced the strength of black voters by creating safe, minority-dominated districts. As justification for these changes, the Defendants cited compliance with the Voting Rights Act and federal case law, which allegedly mandated the drawing of majority-minority districts. *Id.*

On January 31, 1992, a majority of this three judge panel held that there was "no legal mandate or finding of a Voting Rights Act violation to justify Defendants' creation of majority-minority districts wherever possible in the 1991 apportionment plan." *Id.* at 701. Thus, we ordered the Board to draft a new plan or demonstrate that it was remedying a section 2 violation.[4] *Id.* at 702.

The Apportionment Board responded by establishing and adopting a record on February 18, 1992, that, in its view, justified the Board's creation of minority-controlled state legislative districts. Furthermore at its February 18 meeting, the Board amended the 1991 plan to eliminate a series of technical errors in the plan that the Ohio Supreme Court had identified in its separate review of the plan, *Voinovich v. Ferguson,* 63 Ohio St.3d 198, 586 N.E.2d 1020 (1992). The resulting 1992 plan, "Amendment D," created only five majority-minority districts, however, a reduction from the eight majority-minority districts in the 1991 plan, "Amendment C."

On March 10, 1992, after the Board submitted its findings and conclusions, along with the new 1992 plan, this court held that the Board "fail[ed] once again to justify its wholesale creation of majority-minority districts, thus rendering the plan, as submitted, violative of the Voting Rights Act of 1965." *Quilter v. Voinovich,* 794 F.Supp. 756, 757 (N.D.Ohio 1992). Furthermore, this court held that the 1992 plan also violated the Fifteenth Amendment of the United States

---

3. The dissent claims that the Plaintiffs commenced this litigation "to wrest control of Ohio's reapportionment process from the majority of the Board and place it with the federal court system." Dissenting Op. at [1031]. Obviously, such a charge could be leveled against any entity that chooses to challenge a state's infringement of its federal statutory or constitutional rights because it is one of the means to bring such a challenge. Nevertheless, this was not the end or purpose for which the Plaintiffs filed their claim. The Plaintiffs sought a reapportionment plan that was not racially discriminatory, and in filing suit

with the federal court, they were simply utilizing the best means to accomplish that end.

4. We declined to address the Plaintiffs' constitutional claims at this point because our analysis under the Voting Rights Act required the plan to be justified or revised. Likewise, because the Ohio Supreme Court, in *Voinovich v. Ferguson,* 586 N.E.2d 1020 (Ohio 1992) (per curiam), was concurrently considering the Plaintiffs' claim under the Ohio Constitution, we abstained from addressing the pendant claim.

Constitution. *Id.* Nine days later, in response to Defendants' motion for a stay of the March 10 order pending appeal to the United States Supreme Court, this court additionally held that both the 1991 and 1992 plans violated the Fourteenth Amendment because they departed from the requirement that all districts be of nearly equal population. *Quilter v. Voinovich,* No. 5:91CV–2219, 1992 WL 677145, at * 10 (N.D.Ohio Mar. 19, 1992).

The Defendants appealed to the United States Supreme Court. In *Voinovich v. Quilter,* 507 U.S. 146, 113 S.Ct. 1149, 122 L.Ed.2d 500 (1993), the Supreme Court reversed this court's *Quilter* decisions. Denying two of the Plaintiffs' claims, the Court held that the reapportionment plan at issue did not violate section 2 of the Voting Rights Act, nor did it violate the Fifteenth Amendment to the United States Constitution. Nevertheless, the Court held that the Plaintiffs had established a *prima facie* case that the population deviations between the districts violated the Equal Protection Clause, and the Court remanded "only for further proceedings on whether the plan's deviation from equal population among districts violate[d] the Fourteenth Amendment." *Id.* at 152, 113 S.Ct. at 1154.

Upon remand, we held that the Ohio reapportionment plan survived scrutiny under the one-person-one-vote guarantee of the Equal Protection Clause because (1) the Defendants advanced a genuine, rational state policy to justify the deviations from population equality among the state legislative districts, (2) their plan reasonably furthered the rational state policy, and (3) the 13.81% and 10.54% total deviations fell within constitutional limits. *Quilter v. Voinovich,* 857 F.Supp. 579, 587 (N.D.Ohio 1994). Accordingly, judgment was entered for the Defendants on this issue.

 While the latter decision was pending, however, the Plaintiffs moved this court for permission to amend their complaint in light of the Supreme Court's recent decision in *Shaw v. Reno,* 509 U.S. 630, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993).[5] As a lower court, we are bound of course, regardless of the strength of our reservations,[6] to follow the Supreme Court's decision in *Reno,* where the Court held for the first time that a plaintiff could state a claim under the Equal Protection Clause by alleging that a districting plan, "though race-neutral on its face, rationally cannot be understood as anything other than an effort to separate voters into different districts on the basis of race, and that the separation lacks sufficient justification." *Id.* at ——, 113 S.Ct. at 2828. We granted the Plaintiffs' motion,[7] and their

5. In dissent, our colleague argues that the Plaintiffs were actually bringing another vote dilution claim rather than a *Shaw v. Reno* claim. Dissenting Op. at [1031]. Actually, however, this case is simply a classic example that the same set of facts or circumstances may give rise to more than one cause of action. The Supreme Court clearly denied the Plaintiffs' vote dilution claim under section 2 of the Voting Rights Act, but the Court did not address whether the Apportionment Board's use of race in redistricting, ostensibly as a remedial measure pursuant to the Voting Rights Act, violated the Equal Protection Clause of the Fourteenth Amendment. *See Quilter,* 507 U.S. at 156–57, 113 S.Ct. at 1157. The Plaintiffs have brought the latter challenge in the instant case.

6. We note that critics of the Court's decision in *Shaw* have raised compelling concerns with which we sympathize. *See* A. Leon Higginbotham, Jr., et al., *Shaw v. Reno: A Mirage of Good Intentions with Devastating Racial Consequences,* 62 Fordham L.Review 1593 (1994); Brief of the Congressional Black Caucus as *Amicus Curiae* in Support of Appellants, *Unit-*

*ed States v. Hays,* Nos. 94–558/627, 1995 WL 382080 (U.S. June 29, 1995).

7. In dissent, our colleague renews his disagreement with our prior decision to allow the Plaintiffs to amend their Complaint and bring a *Shaw v. Reno* challenge to the reapportionment plan. Dissenting Op. at [1032–1033]; Supp.Dissenting Op. at [1031 n. 3]. The dissent alleges that our decision violated the mandate rule by exceeding the scope of the remand, and he claims that review of a *Shaw* claim actually "required a new lawsuit and a new draw, with a probable different three-judge panel." *Id.*

In our prior decision, we clarified that "while a mandate is controlling as to matters within its compass, on the remand a lower court is free as to other issues." *Quilter v. Voinovich,* 157 F.R.D. 36, 38–39 (N.D.Ohio 1994) (quoting *Quern v. Jordan,* 440 U.S. 332, 347 n. 18, 99 S.Ct. 1139, 1148 n. 18, 59 L.Ed.2d 358 (1979) (quotation omitted)). Under the mandate rule, we may not consider on remand the issues that the Supreme Court decided, but we may consider issues that have not been decided. *See id.* at

complaint was accordingly amended.[8] *Quilter v. Voinovich,* 157 F.R.D. 36, 40 (N.D.Ohio 1994).

Having considered the record evidence and the arguments of the parties, both written and oral, we are prepared to issue our decision.[9] We preface our findings of fact and conclusions of law, however, with a discussion of the governing law that provides the analytical paradigm for our conclusions.

## II. First Principles

### A. Nature of a Shaw v. Reno Claim

■■■ Prior to the Supreme Court's decision in *Reno,* the Court had delineated only two legal theories to support a redistricting challenge under the Equal Protection Clause of the Fourteenth Amendment: (1) violation of the "one-person-one-vote" principle, which requires that districts be equal in population so that the votes cast by voters in one district do not have less weight than those cast by voters in other districts, *Reynolds v. Sims,* 377 U.S. 533, 568, 84 S.Ct. 1362, 1385, 12 L.Ed.2d 506 (1964); and (2) a claim of vote dilution, whereby districts are purposefully drawn to unfairly dilute or diminish the voting strength of an identified group of voters, *Rogers v. Lodge,* 458 U.S. 613, 102 S.Ct. 3272, 73 L.Ed.2d 1012 (1982). *Shaw v. Hunt,*

---

39 (citing *Jones v. Lewis,* 957 F.2d 260, 262 (6th Cir.), *cert. denied,* 506 U.S. 841, 113 S.Ct. 125, 121 L.Ed.2d 80 (1992); *see id.* at 39 n. 1 (citing cases from other circuits holding the same). In this case, the Supreme Court expressly abstained from considering the type of Equal Protection Clause challenge delineated in *Shaw. Voinovich v. Quilter,* 507 U.S. 146, 156–57, 113 S.Ct. 1149, 1157, 122 L.Ed.2d 500 (1993). Thus, the Court's mandate did not prohibit us from considering the issue on remand.

To support the contention that the Plaintiffs' *Shaw* claim required a new lawsuit, new draw, etc., the dissent cites to some Local Rules that give direction with respect to the appropriate disposition of related cases that are filed separately. *See* Dissenting Op. at [1031 n. 2]; Supp.Dissenting Op. at [1031 n. 3]. Yet, these Local Rules would only apply if Plaintiffs had filed a new lawsuit alleging a *Shaw* claim. As such these Local Rules do not support the proposition that the Plaintiffs were "required to file a new lawsuit." Indeed, the dissent offers no supporting authority for this proposition, other than the case law cited in conjunction with the previous argument.

8. The Plaintiffs' Second Amended Complaint revised the First Amended Complaint in only two respects. First, Count IV, entitled "Violation of the Equal Protection Clause—Segregation of Voters by Race Without Compelling Governmental Justification," is added. Second, the prayer for relief was accordingly revised. In pertinent part, Count IV alleges the following:

> 52. ... The reapportionment plan adopted by the Defendants on February 18, 1992 intentionally separated Ohio voters on the basis of race without regard for the traditional redistricting principles set forth in the Ohio Constitution and otherwise without any compelling governmental justification. To justify the creation of race-based districts in the urban centers of Ohio, Defendants asserted that there was widespread racial bloc voting throughout Ohio. The trial court specifically found, and the Supreme Court of the United States con-

firmed, that Ohio did not suffer from legally cognizable racially polarized voting....

> 53. The Defendants deliberately created race-based legislative districts in urban centers initially and then used the purported, but sham, necessity of creating such districts as the basis for ignoring the traditional anti-gerrymandering provisions of the Ohio Constitution throughout the state of Ohio. Absent the ripple effect of the racial gerrymandering in the urban centers of the state of Ohio, the Defendants would not have been forced to ignore on a wholesale basis the directives of Article XI, Section 7, of the Ohio Constitution to follow existing political and legislative boundaries wherever possible.

> 54. ... The decision to abandon the traditional districting mandates contained within the Ohio Constitution is neither compelled by the doctrine of federal supremacy, nor based on any lawful, organized, or rational districting criteria....

> 55. The Defendants have articulated no compelling governmental interest for the wholesale abandonment of the provisions of the Ohio Constitution. As a result, the Defendants have drawn irregular districts in numerous places throughout the state, districts which have no explanation other than the ripple effects caused by the racially drawn districts in the urban centers. In some instances, the racially drawn districts themselves have irregular shapes not required by the Ohio Constitution.

> 56. The districts which have been modified solely on the basis of race include House Districts 31, 30, 22, 21, 38, 39, 44, and 49. No evidence has been presented to the trial court that either legally cognizable remedial action was necessary to draw these racially gerrymandered districts, or that the creation of such districts was narrowly tailored to further any compelling governmental need.

Pls.' Second Am.Compl. ¶¶ 52–56.

9. The court also appreciated and considered an *amicus* brief submitted by the United States Department of Justice, which supported the position of the Defendants.

861 F.Supp. 408, 421 (E.D.N.C.1994), *proba-. ble jurisdiction noted,* —— U.S. ——, 115 S.Ct. 2639, 132 L.Ed.2d 878 (1995); *see also Reno,* 509 U.S. at ——, ——, ——, 113 S.Ct. at 2822, 2823, 2828; *Miller v. Johnson,* —— U.S. ——, ——, 115 S.Ct. 2475, 2501, 132 L.Ed.2d 762 (1995) (Ginsburg, J., dissenting). In *Shaw v. Reno,* however, the Court announced a third means to challenge legislative redistricting under the Equal Protection Clause. The Court held that "a plaintiff challenging a reapportionment [plan] under the Equal Protection Clause may state a claim by alleging that the [plan], though race-neutral on its face, rationally cannot be understood as anything other than an effort to separate voters into different districts on the basis of race, and that the separation lacks sufficient justification." 509 U.S. at ——, 113 S.Ct. at 2828; *Miller,* —— U.S. at ——, 115 S.Ct. at 2482. The Court defined such a deliberate and arbitrary distortion of district boundaries for racial purposes as a "racial gerrymander."[10] *Reno,* 509 U.S. at ——, 113 S.Ct. at 2823.

The *Reno* Court reasoned that "[c]lassifications of citizens solely on the basis of race 'are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality.'" *Id.* at ——, 113 S.Ct. at 2824 (citing *Hirabayashi v. United States,* 320 U.S. 81, 100, 63 S.Ct. 1375, 1385, 87 L.Ed. 1774 (1943)). "They threaten to stigmatize individuals by reason of their membership in a racial group and to incite racial hostility," *City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 493, 109 S.Ct. 706, 721, 102 L.Ed.2d 854 (1989) (plurality opinion), and they "may serve to stimulate our society's latent race-consciousness, suggesting the utility and propriety of basing decisions on a factor that ideally bears no relationship to an individual's worth or needs," *United Jewish Organizations v. Carey,* 430 U.S. 144, 173, 97 S.Ct. 996, 1013, 51 L.Ed.2d 229 (1977) (Brennan, J., concurring in part). These observations were reiterated in the Court's recent decision in *Miller v. Johnson:*

When the State assigns voters on the basis of race, it engages in the offensive and demeaning assumption that voters of a particular race, because of their race, "think alike, share the same political interests, and will prefer the same candidates at the polls." Race-based assignments "embody stereotypes that treat individuals as the product of their race, evaluating their thoughts and efforts—their very worth as citizens—according to a criterion barred to the Government by history and the Constitution."

—— U.S. at ——, 115 S.Ct. at 2485 (citations omitted).

 For these reasons, the Court has held that racial gerrymandering by state legislatures demands close judicial scrutiny; thus, a race-based redistricting plan can be upheld only if it is narrowly tailored to further a compelling state interest. *Reno,* 509 U.S. at ——, ——, ——, 113 S.Ct. at 2825, 2826, 2830; *Miller,* —— U.S. at ——, ——, ——, 115 S.Ct. at 2481, 2485, 2490; *see also Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.,* 429 U.S. 252, 266, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977) (noting that strict scrutiny applies not only to legislation that contains explicit racial classifications but also to those "rare" statutes that are "unexplainable on grounds other than race," even though they are race-neutral on their face). Consistent with prior practice, the *Reno* Court made clear that because a racial gerrymander is a racial classification, it must be reviewed with strict scrutiny even if the drafters of the redistricting plan claim that the plan was drawn with the "benign" purpose of enhancing minority voting strength, —— U.S. at ——, 113 S.Ct. at 2830 ("Equal Protection Clause demands strict scrutiny of all racial classifications ... because without it, a court cannot determine whether or not the discrimination truly is "benign."); *id.* at ——, 113 S.Ct. at 2826 ("[D]istrict lines obviously drawn for the purpose of separating voters by race require careful scrutiny under the Equal Protection Clause regardless of the motivations underly-

---

**10.** The dissent does not find the Supreme Court's definition of racial gerrymandering "particularly enlightening in view of the apparent conflict of meaning between 'deliberate' and 'arbitrary' ac-

tions." Dissenting Op. at [1041]. Evidently, the dissent has never recognized that someone deliberately can act in an arbitrary manner.

ing their adoption."), or claim that the racial gerrymander benefits or burdens the races equally, *id.* at ——, 113 S.Ct. at 2829 (citing *Powers v. Ohio,* 499 U.S. 400, 409, 111 S.Ct. 1364, 1370, 113 L.Ed.2d 411 (1991) ("It is axiomatic that racial classifications do not become legitimate on the assumption that all persons suffer them in equal degree."); *see also Miller,* —— U.S. at ——, 115 S.Ct. at 2481 (noting that racial and ethnic distinctions of any sort are inherently suspect and require exacting judicial scrutiny regardless of the race of those burdened or benefited by the classification).

Although the Court in *Reno* clearly created a new means to challenge state apportionment plans pursuant to the Fourteenth Amendment, its analysis left many unanswered questions that are integral to the proper resolution of a *Shaw v. Reno* claim: (1) Is circumstantial evidence of "bizarre" district shapes necessary to state and sustain a *Shaw v. Reno* claim?; (2) To what extent must "race" be a factor in an apportionment plan before the plan becomes a racial gerrymander subject to strict scrutiny analysis?; (3) Once strict scrutiny is triggered, who has the burden of proof in a *Reno* claim?; (4) What constitutes a "compelling state interest" that would justify race-based redistricting?; and (5) What is the meaning of "narrowly tailored" in the redistricting context? Some of these questions were answered subsequently in the Court's *Miller* decision. We turn now to consider these issues.

### B. Bizarre District Shapes: A Necessary Element?

■ Relying on *Reno,* the Defendants contend that strict scrutiny is not required in this case because "Plaintiffs have not established that any of the districts in [the 1992 plan] are 'bizarre' or 'irregular.'" Defs.' Post Trial Br. at 55. This raises the question of whether the presence of bizarre district shapes is a necessary element or a threshold requirement to state a *Shaw v. Reno* claim.

■ Undeniably, the Court in *Reno* emphasized that the new cause of action under the Fourteenth Amendment was based on the presence of districts whose shapes were so irregular or bizarre that they ration-

ally could not be understood as anything other than an effort to segregate voters on the basis of race. 509 U.S. at ——, ——, 113 S.Ct. at 2828, 2832. Such districts, however, do not draw close constitutional review simply because of their irregular shape. Adherence to traditional districting principles, such as compactness, contiguity, and respect for political subdivisions, is not a constitutional requirement. *Id.* at ——, 113 S.Ct. at 2827 (citing *Gaffney v. Cummings,* 412 U.S. 735, 752 & n. 18, 93 S.Ct. 2321, 2331 & n. 18, 37 L.Ed.2d 298 (1973)). Rather, bizarre-shaped districts demand strict scrutiny because their shape is circumstantial evidence that race has been a purposeful factor in their creation. *See Karcher v. Daggett,* 462 U.S. 725, 755, 103 S.Ct. 2653, 2672, 77 L.Ed.2d 133 (1983) (Stevens, J., concurring) ("One need not use Justice Stewart's classic definition of obscenity—'I know it when I see it'—as an ultimate standard for judging the constitutionality of a gerrymander to recognize that dramatically irregular shapes may have sufficient probative force to call for an explanation." (footnotes omitted)). Logically, therefore, the Supreme Court's use of a district's shape as circumstantial evidence of racial intent implies that proof can be made "by any means, including state concession, bizarre shape, or some combination of the various factors typically used to prove the 'intent' element of an equal protection claim under *Arlington Heights.*" *Hunt,* 861 F.Supp. at 431; *see Arlington Heights,* 429 U.S. at 266, 97 S.Ct. at 563 ("Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.").

The validity of this reasoning was recently confirmed by the Court in *Miller:*

> Our observation in *Shaw* of the consequences of racial stereotyping was not meant to suggest that a district must be bizarre on its face before there is a constitutional violation. Nor was our conclusion in *Shaw* that in certain instances a district's appearance (or, to be more precise, its appearance in combination with certain demographic evidence) can give rise to an equal protection claim, 509 U.S., at [——,

113 S.Ct. at .2834], a holding that bizarreness was a threshold showing, as appellants believe it to be. Our circumspect approach and narrow holding in *Shaw* did not erect an artificial rule barring accepted equal protection analysis in other redistricting cases. Shape is relevant not because bizarreness is a necessary element of the constitutional wrong or a threshold requirement of proof, but because it may be persuasive circumstantial evidence that race for its own sake, and not other districting principles, was the legislature's dominant and controlling rationale in drawing its district lines. The logical implication, as courts applying *Shaw* have recognized, is that parties may rely on evidence other than bizarreness to establish race-based districting.

— U.S. at ——, 115 S.Ct. at 2486. Thus, "parties alleging that a State has assigned voters on the basis of race are neither confined in their proof to evidence regarding the district's geometry and makeup nor required to make a threshold showing of bizarreness" in order to state a valid *Shaw v. Reno* claim. *Miller,* at ——, 115 S.Ct. at 2487.

Now that we have discussed the types of evidence that a party can marshall to sustain a *Shaw v. Reno* claim, we turn to consider both the extent to which race must be a factor in an apportionment plan before the plan becomes a racial gerrymander subject to strict scrutiny and the party that bears that burden of proof.

### C. The Trigger for Strict Scrutiny

■ The Court in *Reno* did not specify the threshold showing of racial consideration that was necessary to establish that a redistricting plan was a racial gerrymander requiring close judicial scrutiny. The Court did, however, narrow the spectrum by significantly reiterating the principle that "awareness" of race or "race consciousness" in the districting process is not equivalent to a racial gerrymander that requires strict scrutiny analysis:

> [R]edistricting differs from other kinds of state decisionmaking in that the legislature always is *aware* of race when it draws district lines, just as it is aware of age, as

economic status, religious and political persuasion, and a variety of other demographic factors. That sort of race consciousness does not lead inevitably to impermissible race discrimination.

509 U.S. at ——, 113 S.Ct. at 2826 (emphasis in original).

■ In *Miller v. Johnson,* the Court clarified the burden of proof necessary to trigger strict scrutiny:

> Although race-based decisionmaking is inherently suspect, until a claimant makes a showing sufficient to support that allegation the good faith of a state legislature must be presumed.... The plaintiff's burden is to show, either through circumstantial evidence of a district's shape and demographics or more direct evidence going to legislative purpose, that race was the *predominant factor* motivating the legislature's decision to place a significant number of voters within or without a particular district. To make this showing, a plaintiff must prove that the legislature subordinated traditional race-neutral districting principles, including but not limited to compactness, contiguity, respect for political subdivisions or communities defined by actual shared interests, to racial considerations. Where these or other race-neutral considerations are the basis for redistricting legislation, and are not subordinated to race, a state can "defeat a claim that a district had been gerrymandered on racial lines."

— U.S. at ——, 115 S.Ct. at 2488 (citations omitted and emphasis added).

Despite this clarification, there remains some ambiguity regarding the *Miller* "predominant factor" test. Specifically, what did the majority mean when it said that a plaintiff must prove that the legislature "subordinated" traditional districting principles to racial considerations in order to trigger strict scrutiny? Does this mean that a plaintiff must prove that the legislature disregarded or abandoned traditional districting principles in favor of racial considerations or does it mean that strict scrutiny will be triggered even if a state legislature follows traditional districting principles, simply because those

principles were accorded less emphasis or less weight than racial considerations?

The ambiguity inherent in the *Miller* Court's predominant factor test is highlighted by the concurring opinion of Justice O'Connor and the dissenting opinion of Justice Ginsburg. Although no other justice joined her opinion, Justice O'Connor wrote separately to emphasize her understanding of the Court's predominant factor test:

> I understand the threshold standard the Court adopts—"that the legislature subordinated traditional race-neutral districting principles . . . to racial considerations,"—to be a demanding one. To invoke strict scrutiny, a plaintiff must show that the State has relied on race *in substantial disregard* of customary and traditional districting practices.

*Miller,* at ——, 115 S.Ct. at 2493 (O'Connor, J., concurring) (citation omitted and emphasis added). Justice Ginsburg in dissent, joined by Justices Stevens, Breyer, and Souter, interpreted the Court's new predominant factor test differently:

> Today the Court expands the judicial role, announcing that federal courts are to undertake searching review of any district with contours "predominantly motivated" by race: "strict scrutiny" will be triggered not only when traditional districting practices are *abandoned,* but also when those practices are *"subordinated to"—given less weight* than race. Applying this new "race-as-predominant-factor" standard, the Court invalidates Georgia's districting plan even though Georgia's Eleventh District, the focus of today's dispute, bears the imprint of familiar districting practices.

*Id.* at ——, 115 S.Ct. at 2499 (Ginsburg, J., dissenting) (citation omitted and emphasis added).

The majority, itself, recognized, as it had in *Shaw,* 509 U.S. at ——, 113 S.Ct. at 2827, that a legislature's compliance with traditional districting principles may well suffice to defeat a claim of racial gerrymandering, but such a refutation was not possible in *Miller* because the Court found that the State of Georgia had subordinated those factors to racial objectives. *Miller,* —— U.S. at ——, 115 S.Ct. at 2489. As proof of subordination,

the majority pointed to an objection of Georgia's Attorney General that was lodged with the Justice Department in response to the Justice Department's demand for three majority-black districts in Georgia. *Id.* The State Attorney General claimed that to comply with such a demand the State would have to " 'violate all reasonable standards of compactness and contiguity.' " *Id.* The Court found such a statement to be "powerful evidence that the legislature subordinated traditional districting principles to race when it ultimately enacted a plan creating three majority-black districts." *Id.* Nevertheless, a fair interpretation of this language does not lead to the conclusion that "subordination" can only be proven if a state abandons or violates traditional districting principles in favor of racial considerations. In fact, as Justice Ginsburg pointed out in dissent, Georgia's Eleventh District, which the majority held to be an example of "subordination," actually bore "the imprint of familiar districting practices." *Id.* at ——, 115 S.Ct. at 2499 (Ginsburg, J., dissenting); *id.* at —— – ——, 115 S.Ct. at 2502–2503 (Ginsburg, J., dissenting) (noting specifically how the Eleventh District's design reflects the significant consideration of traditional districting factors).

Moreover, the conclusion that "subordination" can only be proven if a state abandons or violates traditional districting principles in favor of racial considerations constitutes a logical fallacy. The presupposition of such a conclusion is that if districts are drawn on the basis of traditional districting principles—compactness, contiguity, etc., then such districts cannot be the result of racial gerrymandering. Such a conclusion is fallacious because it is certainly possible, both logically and factually, that districts could be crafted within the confines of traditional districting principles and still be predominantly motivated by racial considerations at the same time. Furthermore, to conclude otherwise accords a preclusive constitutional significance to a state's compliance with traditional districting principles, which exceeds the significance accorded by the Court. *See Reno,* 509 U.S. at ——, 113 S.Ct. at 2816.

Taken together, all of this language leads us to conclude that a plaintiff may satisfy the predominant factor test and prove that traditional districting principles were subordinated to racial objectives not only when a state violates or abandons traditional districting principles in favor of racial motivations but also when a state substantially complies with traditional districting principles and gives them less weight in the apportionment process than racial considerations.

Although the Plaintiffs in this equal protection challenge bear the ultimate burden of persuasion throughout the proceeding, *see id.* —— U.S. at ——, 115 S.Ct. at 2488; *Batson v. Kentucky,* 476 U.S. 79, 93–94 & n. 18, 106 S.Ct. 1712, 1721 & n. 18, 90 L.Ed.2d 69 (1986); *Wygant,* 476 U.S. at 277–78, 106 S.Ct. at 1848–49, if the Plaintiffs offer proof substantiating that race was the predominant factor motivating the state's apportionment process, then this gives rise to a presumption that the plan is unconstitutional, and the burden shifts to the Defendants to demonstrate that their use of race was narrowly tailored to meet a compelling state interest, *see Croson,* 488 U.S. at 505, 109 S.Ct. at 728; *Hunt,* 861 F.Supp. at 436. Yet, the Defendants' shifted burden is one of production only, not persuasion. The Plaintiffs still bear the ultimate burden of persuading the court that the Defendants did not have a compelling state interest that justified their use of race in apportionment process or that the Defendants' redistricting plan was not narrowly tailored to meet such an interest. *See Wygant,* 476 U.S. at 292–93, 106 S.Ct. at 1856–57 (O'Connor, J., concurring); *Hunt,* 861 F.Supp. at 436.

### D. Compelling State Interest

Next, we consider those reasons that might serve as a compelling state interest, justifying a state's decision to engage in race-based redistricting. At this point, we are not concerned with whether the Defendants in this case had a compelling justification for their consideration of race in the 1992 plan; we are concerned with whether the Defendants had a compelling justification for *any* redistricting plan that considered race as a predominant factor. The question of "wheth-er the particular plan under challenge takes race into account to a greater degree than necessary to further a compelling state interest is a question for the 'narrowly tailored' prong of the strict scrutiny analysis, which examines the 'fit' between the compelling state interest and the precise means chosen by the state to accomplish it." *Hunt,* 861 F.Supp. at 437 (citing *Wygant,* 476 U.S. at 280 & n. 6, 106 S.Ct. at 1850 & n. 6, and *Fullilove,* 448 U.S. at 507, 100 S.Ct. at 2789 (Powell, J., concurring)). Without presenting an exhaustive review of those reasons that theoretically might serve as a compelling state interest in the redistricting context, we have chosen to limit our discussion to the compelling interest that the Defendants have offered in this case—compliance with section 2 of the Voting Rights Act. Defs.' Post Trial Br. at 57–63.

In *Shaw v. Reno,* the state argued that compliance with the Voting Rights Act was a compelling state interest. 509 U.S. at ——, 113 S.Ct. at 2830. The Court, however, stopped short of totally endorsing this claim: "The states certainly have a very strong interest in complying with federal antidiscrimination laws that are constitutionally valid as interpreted and as applied." *Id.;* *see Miller,* —— U.S. at ——, 115 S.Ct. at 2490. Obviously, the Court is aware that in strict scrutiny parlance a "compelling state interest" is a term of art. Thus, we do not think the Court's choice of the words "very strong interest" is insignificant. It suggests to us that the Voting Rights Act may serve as a compelling state interest in some circumstances, but in others, state action ostensibly in conformity therewith may violate the Equal Protection Clause of the Fourteenth Amendment. *See Miller,* at ——, 115 S.Ct. at 2490; *see also Johnson v. De Grandy,* —— U.S. ——, —————, 114 S.Ct. 2647, 2666–67, 129 L.Ed.2d 775 (1994) (Kennedy, J., concurring) ("Given our decision in *Shaw,* there is good reason for state and federal officials with responsibilities related to redistricting [that are engaging in remedial action pursuant to section 2 of the Voting Rights Act], as well as reviewing courts, to recognize that explicit race-based districting embarks us on a most dangerous course. It is neces-

sary to bear in mind that redistricting must comply with the overriding demands of the Equal Protection Clause.").

 Previously, the Court has recognized a state's compelling interest in taking race-based remedial measures to eradicate the effects of past racial discrimination. *Miller*, —— U.S. at ——, 115 S.Ct. at 2490 (citing *Reno*, 509 U.S. at ——, 113 S.Ct. at 2831 (citing *Croson*, 488 U.S. at 491–93, 109 S.Ct. at 720–721; *Wygant*, 476 U.S. at 280–82, 106 S.Ct. at 1850–51)). Furthermore, the Court has recognized that this interest extends to remedying past or present violations of federal statutes that were intended to eliminate discrimination in specific aspects of life. *See Croson*, 488 U.S. at 500, 109 S.Ct. at 725 ("constitutional or statutory violation"); *Wygant*, 476 U.S. at 289, 106 S.Ct. at 1854 (O'Connor, J., concurring) ("violation of federal statutory or constitutional requirements"). Moreover, the Court has clarified that a state does not have to await a judicial finding that it has committed past or present discrimination before it voluntarily takes remedial action to eradicate the discrimination, so long as it has a " 'strong basis in evidence for its conclusion that remedial action was necessary.' " *Croson*, 488 U.S. at 500, 109 S.Ct. at 725 (quoting *Wygant*, 476 U.S. at 277, 106 S.Ct. at 1848); *Miller*, —— U.S. at ——, ——, 115 S.Ct. at 2490, 2491; *Hunt*, 861 F.Supp. at 437.

 Applying these principles to the redistricting context and the Voting Rights Act, the *Hunt* court developed a very useful standard by which to determine when the Voting Rights Act can serve as a compelling state interest:

Under these principles, we think it clear that a state has a "compelling" interest in engaging in race-based redistricting to give effect to minority voting strength whenever it has a "strong basis in evidence" for concluding that such action is "necessary" to prevent its electoral districting scheme from violating the Voting Rights Act.

. . . .

A state has a "strong basis in evidence" for concluding that it must engage in race-based redistricting in order to comply with the Voting Rights Act when it has information sufficient to support a *prima facie* showing that its failure to do so would violate the Act. *See Croson*, 488 U.S. at 500 [109 S.Ct. at 725] (majority) (evidence "approaching a prima facie case of a constitutional or statutory violation").

*Hunt*, 861 F.Supp. at 437–439; *see Johnson v. Miller*, 864 F.Supp. 1354, 1381 (S.D.Ga. 1994), *aff'd*, —— U.S. ——, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995).

 Generally, to establish a prima facie case that a single-member redistricting plan violates section 2 of the Voting Rights Act, a plaintiff must show three things, the *Gingles* preconditions:

First, [the plaintiff] must show that the minority group " 'is sufficiently large and geographically compact to constitute a majority in a single-member district.' " Second, [the plaintiff] must prove that the minority group " 'is politically cohesive.' " Third, the plaintiff[ ] must establish " 'that the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate.' "

*Voinovich v. Quilter*, 507 U.S. at 157, 113 S.Ct. at 1157 (quoting *Growe v. Emison*, 507 U.S. 25, 39, 113 S.Ct. 1075, 1084, 122 L.Ed.2d 388 (1993) (quoting *Thornburg v. Gingles*, 478 U.S. 30, 50–51, 106 S.Ct. 2752, 2766–67, 92 L.Ed.2d 25 (1986))); *Johnson*, 864 F.Supp. at 1387; *Hunt*, 861 F.Supp. at 440. Thus, when a state has reliable information that indicates the relevant minority group could establish a prima facie challenge under section 2 of the Voting Rights Act to the existing districting plan, then it has a "strong basis in evidence" for concluding that it must engage in race-based redistricting to comply with section 2 of the Voting Rights Act, and it has established a "compelling interest" for the remedial measures. *Hunt*, 861 F.Supp. at 440.

### E. Narrowly Tailored

Finally, we consider how to determine whether a racial gerrymander, if justified by a compelling state interest, is narrowly tailored to further that interest. The Court provided little help with this issue in *Reno*,

other than to say that in the context of a challenge under section 5 of the Voting Rights Act, "[a] reapportionment plan would not be narrowly tailored if the State went beyond what was reasonably necessary to avoid retrogression." Therefore, we agree with the *Hunt* court that the best analytical approach is to examine the Court's decisions that apply the narrowly tailored standard in other race-based remedial contexts. *See Hunt,* 861 F.Supp. at 444–45.

■ In other race-based contexts, the Court has examined five factors to determine whether a race-based affirmative action plan is narrowly tailored to serve the compelling state interest in remedying the discrimination: (1) the efficacy of alternative remedies that were less race-based or race-neutral; (2) whether the plan utilizes a fixed racial quota or a flexible racial goal; (3) the duration of the plan; (4) the relationship between the plan's goal for minority representation in the pool of applicants selected to receive the affirmative action and the percentage of minorities in the relevant pool of eligible candidates; and (5) the impact of the plan on the rights of third parties. *See United States v. Paradise,* 480 U.S. 149, 171–85, 107 S.Ct. 1053, 1066–74, 94 L.Ed.2d 203 (1987) (plurality); *Local 28, Sheet Metal Workers' Int'l Ass'n v. EEOC,* 478 U.S. 421, 485–89, 106 S.Ct. 3019, 3055–57, 92 L.Ed.2d 344 (1986) (Powell, J., concurring); *see also Croson,* 488 U.S. at 507–08, 109 S.Ct. at 729; *Wygant,* 476 U.S. at 279–84, 106 S.Ct. at 1849–52. Although these criteria were developed in contexts other than race-based redistricting, we think they are easily adapted to this context. While we have engaged in a rigorous analysis, our inquiry has been careful and sensitive.

■ Considering the first factor, a court must decide whether the state could have accomplished its compelling interest by some means that were less race-based or race-neutral. *Wygant,* 476 U.S. at 280 n. 6, 106 S.Ct. at 1850 n. 6. If compliance with the Voting Rights Act is a state's compelling interest then, obviously, a race-neutral alternative does not exist. Assuming race must be considered to comply with the Voting Rights Act, the question then becomes

whether a state could have complied with the Voting Rights Act with means that were less race-based. The Plaintiffs in this case do not allege that the Apportionment Board created more majority-minority districts than is reasonably necessary to comply with the Voting Rights Act. Rather, they generally claim that the Board packed black voters into districts to comprise less than a majority, where a black minority population, in conjunction with significant white crossover votes, already had ample opportunity to elect the candidate of its choice without the addition of the black voters. This packing of black voters into districts where they were not needed allegedly resulted in a waste of black votes in the "packed" districts and a loss of minority "influence" in those districts where the black voters were previously located. Assuming *arguendo* that such race-based measures truly further compliance with section 2 of the Voting Rights Act, the analytical question becomes a two-fold concern: whether the 1992 plan creates more "packed" districts than is reasonably necessary to comply with the Act and whether the "packed" districts it creates contain substantially larger concentrations of minority voters than is reasonably necessary to give minority voters a realistic opportunity to elect representatives of their choice in those districts. *See Hunt,* 861 F.Supp. at 446.

■ Regarding the second factor, a court must determine whether the challenged plan requires a fixed racial quota that is crafted to achieve a racial balance or requires a flexible goal to be used as a standard in gauging the state's efforts at eradicating the discrimination in question. *See Sheet Metal Workers,* 478 U.S. at 477–78, 106 S.Ct. at 3050–51. We agree with the *Hunt* court that racial gerrymanders will "seldom be invalid on this ground" because they do not impose a fixed racial quota. 861 F.Supp. at 446. Even if a state creates a certain number of districts that are designed to elect minority representatives, there is no guarantee that minority representatives will be elected. Thus, such districts can hardly be viewed as anything other than examples of an acceptable, flexible goal for minority representation. *See Sheet*

*Metal Workers,* 478 U.S. at 487–88, 106 S.Ct. at 3056.

[26] The third factor invokes consideration of the planned duration of the remedial measure. If it is not a temporary provision, it may last longer than reasonably necessary to eliminate the effects of the targeted discrimination. *See id.* at 479, 106 S.Ct. at 3051 (noting that a temporary race-based remedial measure is acceptable because it "will end as soon as ... it is no longer needed to remedy past discrimination"). A race-based redistricting plan in Ohio will likely satisfy this test because the State is required, as a practical matter, to redistrict after each decennial census, and this will result in re-consideration and possible termination of the previous race-based plan.

The fourth factor requires the court to consider whether the remedial plan presents a reasonable relationship between the plan's goal for minority representation in the pool of applicants selected to receive the affirmative action and the percentage of minorities in the relevant pool of eligible candidates. As applied to the redistricting context, we think this requirement is satisfied so long as the percentage of racially-packed districts does not substantially exceed the percentage of minority voters throughout the state. *See Johnson v. De Grandy,* —— U.S. at —— & n. 11, 114 S.Ct. at 2658 & n. 11 (noting that ultimate right of section 2 of Voting Rights Act is minority voters' equal opportunity to elect candidate of their choice, as measured by proportionality between percentage of majority-minority voting districts in state to minority members' share of the relevant population throughout the state).

 The fifth factor requires a court to consider whether the challenged plan "impose[s] an unacceptable burden on innocent third parties." *Paradise,* 480 U.S. at 182, 107 S.Ct. at 1072. As applied to the redistricting context, we agree with the *Hunt*

court that "a race-based redistricting plan imposes an unacceptable burden upon third parties, [and] hence is not sufficiently 'narrowly tailored' to survive constitutional muster, if it fails to comply with redistricting principles that are themselves constitutionally mandated, like the 'one person, one vote' standard and the prohibition against undue dilution of the voting strength of any identifiable group of voters." *Hunt,* 861 F.Supp. at 449. Like the *Hunt* court, however, we do not think that a racial gerrymander imposes an unacceptable burden on third parties simply because the redistricting plan has a bizarre shape or deviates from traditional districting principles, which, themselves, are not constitutionally mandated.[11] *Id.* at 449–56.

 At this point we note that it is important for all the issues presented in this case to be analyzed in a way that gives expression to the constitutionally and statutorily based national goal of protecting the rights of persons victimized by historic discrimination, so that they may effectively participate in changing public policies to "ensure nondiscrimination and fair opportunities in education, employment, housing, and other areas." Arthur A. Baer & Pamela S. Karlan, *Voting Rights Act Enforcement: An Agenda for Equal Electoral Opportunity,* in New Challenges, The Civil Rights Record of the Clinton Administration Mid-term 169 (Report of the Citizen's Commission on Civil Rights, 1995). Court decisions of today must be mindful of the Supreme Court's admonition over one hundred years ago in *Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886), that the right to vote is a "fundamental political right, because preservative of all rights." The issue presented in this case must not be responded to in such a way as to gut the Voting Rights Act's promise of equal electoral opportunity. When minority voters are deliberately and purposefully packed into a district where they are unnecessary to the election of the minority's

---

11. Consider the words of Chief Justice Warren Burger in *Swann v. Charlotte–Mecklenburg Bd. of Educ.,* 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971), where the Court considered and approved the use of race-sensitive remedies to combat segregated schools: "The remedy for such segregation may be administratively awkward, inconvenient and even bizarre in some situations; and may impose burdens on some; but all awkwardness and inconvenience cannot be avoided in the interim period when remedial adjustments are being made to eliminate the dual school system." *Id.* at 28, 91 S.Ct. at 1282.

candidate of choice, who is capable of "changing public policies," such a plan must be justified by a compelling governmental purpose. This is particularly true when the effect of such a scheme is likely to be to reduce the opportunity for minority voters to coalesce with other voters to influence the election of candidates of their choice in the districts from which they are drawn. When this occurs the very spirit of the Voting Rights Act is eroded. The risk has prompted us to reject portions of the 1992 plan at issue here.

### III. Findings of Fact and Conclusions of Law

Based on our review of the evidence submitted by both parties, we find, for the following reasons, that racial considerations were the predominant factor in the Defendants' 1992 reapportionment plan:

1. The Plaintiffs' claims of racial gerrymandering are somewhat unusual in this case. First, they allege that the Defendants drew race-based legislative districts in the urban areas of Ohio and that this decision had the ripple effect of causing irregular shaped districts throughout the State, which violated the traditional districting principles embodied in the Ohio Constitution, particularly Article XI, § 7. Pls.' Second Am.Compl. ¶ 55. In addition, the Plaintiffs alleged that some of the race-based districts, themselves, had irregular shapes in violation of the traditional districting principles contained in the Ohio Constitution. *Id.* Finally, the Plaintiffs alleged that the racially gerrymandered districts "included" House districts 31, 30, 22, 21, 38, 39, 44, and 49. *Id.* ¶ 56. The Defendants contend that the Plaintiffs are limited to challenging only these eight districts, which were identified in their complaint. The Defendants, however, mischaracterize the Plaintiffs' complaint. The word "included" clearly is not an exclusive term. Thus, the eight districts identified in the complaint were illustrative of the alleged race-based districts but not necessarily an exclusive listing of them. That said, however, we note that we are not concerned with districts whose irregular shape may have been the ripple effect of another district that was racially gerrymandered. Such an irregular district may indeed violate proscriptions of the Ohio Constitution, but the focus of a *Shaw v. Reno* claim is racial gerrymandering in violation of the Fourteenth Amendment to the United States Constitution. Thus, we are only concerned in this case with districts that allegedly have been racially gerrymandered.

2. The Defendants admittedly considered race when drafting their 1992 apportionment plan. The Apportionment Board instructed Tilling to "draw a plan that was in comportment with the Ohio Constitution, the Fourteenth and Fifteenth Amendments of the United States Constitution and the Voting Rights Act," and Tilling attempted to comply. Hr'g Tr. at 208. Tilling considered race to avoid dilution of minority voting strength in violation of the Voting Rights Act. *Id.* at 308.

3. Before Tilling drafted an apportionment plan, he attended public hearings throughout the state. At these hearings the Apportionment Board heard testimony from some members of the minority community requesting the Board to enhance minority voting strength by creating more majority-minority districts. Defendants' Post–Trial Br. at 2–3. At these hearings, Tilling publicly stated that consideration of and compliance with the Voting Rights Act was an important principle guiding the apportionment process. *Id.* at 3–5.

4. The Apportionment Board's Findings and Conclusions, adopted on February 18, 1992,[12] in support of the 1992 plan,

---

12. The Apportionment Board has not met since February 18, 1992, either to change or modify its findings regarding the 1992 plan. Thus, these findings constitute direct evidence of the Apportionment Board's rationale and justification for the 1992 plan.

reveal not only that race was a substantial and motivating factor in the reapportionment process but that it was the predominant factor in certain house districts. Based on the conclusions that the Voting Rights Act protected classes of voters, not incumbents, *see, e.g.,* Bd. Findings ¶¶ 177, 183, and that racial bloc voting existed throughout the State of Ohio, including districts containing minority voters, *id.* ¶¶ 124, 167, the Apportionment Board decided that it needed to create districts that would contain sufficient black population to guarantee the election of any new (non-incumbent) black candidate. Thus, the Board through Tilling added black voters to minority districts outside of Cuyahoga County because "there [wa]s insufficient black population in the minority districts to guarantee the election of a black candidate particularly given levels of voter turnout and racial bloc voting in the district." *Id.* ¶ 168. Obviously, one of the working assumptions in this process was that black voters would choose only a black candidate as their representative. This is clearly one of the *demeaning* and offensive assumptions that the Supreme Court has previously criticized as an impermissible racial stereotype. *See Miller,* —— U.S. at ——, 115 S.Ct. at 2485 (citing *Reno,* 509 U.S. at ——, 113 S.Ct. at 2827).

5. The Board's analysis of incumbency elections in minority districts for 1984, 1986, 1988, and 1990, revealed an incumbency advantage of six to ten percent, *id.* ¶ 171, 173, and the Board concluded that it was unreasonable to configure districts based on the current incumbent because the successful incumbents might retire, die, or move on to other political positions during the 90's, *id.* at 172. *See also* Bd. Conclusion of Law ¶ 9 ("It is unreasonable to reconfigure minority districts based on the electoral success of minority incumbents. Further, such reconfiguration will result in impermissible minority vote dilution. Consideration of factors such as racial bloc voting, voter turnout, population shifts, demographics, incumbency factors, voting patterns and other such factors require that minority districts outside Cuyahoga County must reflect increased relative percentages of black voting age population.") Accordingly, the Board determined that "unless Black Voting Age Population margins are adopted in minority districts, minorities risk losing minority districts." Bd. Findings ¶ 174.

6. In Franklin County, the Board drew district lines to enhance the possibility of electing a new black candidate. Board Finding 189 indicates that Tilling "reconfigured House districts 29 and 31 in Franklin County to protect minority voters in those districts and to create a minority Senate District in Franklin County where none previously existed." *Id.* ¶ 189. Tilling testified that the incumbent black legislators, Reps. Miller and Beatty, had indicated a desire to run for different offices, and because the Voting Rights Act protects classes of voters and not incumbents, black voters were added to the districts of Reps. Miller and Beatty to achieve this goal. *Id.* ¶ 189. The percentage of black population in Rep. Miller's district, H.D. 22 under the 1992 plan, was increased from 38.50% to 44.68% (40.98% black voting age population), a 6.18% increase, which is within the 6–10% standard that would be necessary to compensate for the possible loss of incumbency advantage. Defs.' Supp.Exs., Vol. I, Ex. DD. Likewise, the black population in Rep. Beatty's district, H.D. 21 under the 1992 plan, was increased from 46.80% to 54.30% (48.30% black voting age population), an increase of 7.50%. *Id.* Both Miller and Beatty previously had been elected to six and seven terms, respectively, Bd. Findings ¶ 162, by pluralities of better than two-to-one.

7. In Lucas County, the Board drew lines to enhance the possibility of electing a new black candidate. Tilling stated that he drew the districts in Lucas

County "to protect a class of voters, not the particular incumbent in that situation." *Id.* ¶ 177. Tilling added additional minority votes to Rep. Casey Jones' district, H.D. 49 under the 1992 plan, "not because Casey Jones needed them but because down the road in this decade whoever is his successor needs the opportunity to give minorities a clear chance to elect a candidate of their choice." *Id.* Moreover, Tilling accepted the rationale of increasing minority voters in Casey Jones' district because the growth of the University of Toledo had displaced a number of individuals, causing some shift of population in his district, and because Jones might be nearing retirement age. *Id.* ¶ 195. The black population in Jones' district was increased from 41.70% to 49.99% (46.42% black voting age population), an increase of 8.29%. Defs.' Supp.Exs., Vol. I, Ex. DD.

8. In Summit County, the Board drew lines to enhance the possibility of electing new black candidates. Based on the conclusion that Rep. Vernon Sykes' district, H.D. 44 under the 1992 plan, was "losing black population and to avoid minority vote dilution," Bd. Findings ¶ 194, the Board increased the black population in Sykes' district from 35.40% to 43.07% (39.86% black voting age population), an increase of 7.67%, Defs.' Supp.Exs., Vol. I, Ex. DD. Previously Sykes had been elected to five terms by margins of two-to-one. Bd. Findings ¶ 162.

9. In Montgomery County, the Board drew lines to guarantee the election of new black candidates. Again, based on "population shifts" and the desire to "avoid dilution of minority voting," the Board increased the black population in Rep. McLin's and Rep. Roberts' districts, H.D. 38 and H.D. 39, respectively under the 1992 plan. *Id.* ¶ 193. The black population in McLin's district was increased from 42.10% to 44.47% (41.56% black voting age population), an increase of 2.30% and the black population in Roberts' district

was increased from 36.10% to 40.69% (36.71% black voting age population), an increase of 4.59%. Defs.' Supp. Exs., Vol. I, Ex. DD.

10. In Hamilton County, the Board drew lines to enhance the possibility of electing new black candidates. The Board found the following:

Mr. Tilling, in drafting the 1991 Apportionment Plan, also determined that the Voting Rights Act protected classes of voters not incumbents. Since Representative Mallory is in his 60's, there is a particular need to reconfigure House District 23 [H.D. 31 in the 1992 plan] to increase the relative percentage of black population in that district in order to provide an opportunity for a new black candidate, without the benefit of incumbency, to be elected in the district.

Bd. Findings ¶ 183. Accordingly, the Board increased the black population in Mallory's district from 45.90% to 49.16% (43.13% black voting age population), an increase of 3.26%. Defs.' Supp.Exs., Vol. I, Ex. DD. The Board also increased the black population in Rep. Rankin's district, H.D. 30 in the 1992 plan, from 53.20% to 55.98% (52.72% black voting age population), an increase of 2.78% in a district that was already a majority-minority district. *Id.* The Board increased the black population in Rankin's district allegedly because "[a] new black candidate would require a district with increased black population to be successful." Bd. Findings ¶ 186.

11. In addition to the Apportionment Board's Findings and Conclusions, Tilling, who was the principal architect of the apportionment plan, kept handwritten notes that indicated his procedure and his predominant use of race in drawing the original apportionment plan. *See* Pls.' Ex. Prior Proceeding B, No. 120. The notes revealed that in his first five steps Tilling calculated the ideal population size of the Senate and House districts, pursuant to Article XI, Section 2 of the Ohio Constitution, and determined those counties that had popula-

tions within five percent of the ideal in accordance with Article XI, Section 10 of the Ohio Constitution. Beginning with step six and continuing with each urban county thereafter, the notes repeatedly indicate that Tilling displayed the minority population of each urban county on his computer screen and then drew the "minority districts" first before proceeding. This process and the heightened attention to racial composition was confirmed. at the hearing when Tilling testified concerning the maps of the urban districts drawn in accordance with the process contained in the notes. Hr'g Tr. at 344–51. Viewed sequentially, the maps indicated that for each urban county, the minority population was displayed; the most heavily black districts were drawn first; and each succeeding district that was drawn contained a decreasing percentage of black population. The Plaintiffs claim that the maps in conjunction with the notes establish that race was "the predominant concern of Mr. Tilling and the Board." Pls.' Post Trial Br. at 14. The Defendants contend that Tilling's notes and the corresponding maps are irrelevant because they refer to the original "model" plan that Tilling submitted to the Board on September 26, 1991. Although it is true that this exact plan was never in effect and was modified on numerous occasions, we still find it probative of the Defendants' predominant consideration of race in the redistricting process. The

fact remains that a not-too-distant forerunning of the 1992 plan was drawn in the aforementioned manner, and the Defendants do not contend that the 1992 plan totally discarded the procedure and results of the original plan.[13]

12. At this point we note that for purposes of this case, we assume without holding that the Apportionment Board substantially complied with the traditional districting principles mandated in Article XI of the Ohio Constitution. Based on our earlier analysis of the *Miller* Court's predominant factor test, *see supra* part II.C., we find it unnecessary to specifically address whether the Defendants complied with the traditional districting principles contained in the Ohio Constitution because even if a state substantially adheres to traditional districting principles, a plaintiff can still prove that racial objectives were the predominant factor in the apportionment process if traditional districting principles were subordinated to—given less weight than—racial considerations. *See Miller,* —— U.S. at ——, 115 S.Ct. at 2488; *id.* at ——, 115 S.Ct. at 2499 (Ginsburg, J., dissenting). Nevertheless, we note that the Board's compliance with the traditional districting principles in the Ohio Constitution is a hotly contested matter, *see* Pls.' Post–Hr'g Br. at 36–49, on which we have previously chosen to abstain, *see Quilter,* 794 F.Supp. at 702.[14]

13. Originally, the dissent agreed that the notes of Tilling "strongly suggest[ed] that he purposefully considered race when he drew the house district boundaries in Amendment D" and that this evidence of race-based action should trigger strict scrutiny. Dissenting Op. at [1041 n. 9]; *see also* Dissenting Op.App. A. ¶¶ 21, 23, 30, 38, 45, 53, 60, 68, and 75. In light of the Supreme Court's adoption of the predominant factor test in *Miller,* however, the dissent has changed its position and decided that Tilling's notes are not sufficient to trigger strict scrutiny. Supp.Dissenting Op. at [—— & n. 4]. Nevertheless, the dissent continues to ignore totally the better and more complete direct evidence of the Board's race-based redistricting that was contained in the Board's

Findings and Conclusions, which were adopted specifically in support of the 1992 plan. *See supra* part III., ¶¶ 4–10.

14. Were we to decide to consider this issue, however, we note that as a preliminary matter we would have to decide whether this court was precluded from addressing the constitutionality of the 1992 plan under Article XI of the Ohio Constitution because of the Ohio Supreme Court's previous decision in *Voinovich v. Ferguson,* 63 Ohio St.3d 198, 586 N.E.2d 1020 (1992) (per curiam). Ultimately, under the Ohio Constitution, the Ohio Supreme Court held the following: "The court finds against the counterclaimants on their claim that the plan is

13. Based on our thorough review and consideration of all the evidence presented in this case, we find that race was the predominant motivating factor in the Defendants' creation of House districts 21, 22, 30, 31, 38, 39, 44, and 49 in the 1992 plan because traditional districting principles were subordinated to or given less weight in the reapportionment process than racial considerations. These House districts are the result of racial gerrymandering. Although none of these districts presents a bizarre shape, both direct evidence from trial testimony and the Apportionment Board's Findings and Conclusions, and circumstantial evidence from Tilling's notes and the accompanying maps, clearly reveal that the Defendants intentionally crafted these eight districts with the predominant purpose of separating voters on the basis of race.

14. Because race was the predominant motivating factor in the drafting of these eight districts in the 1992 plan, they must be subjected to strict scrutiny analysis. *Miller,* —— U.S. at ——, 115 S.Ct. at 2490. Thus, the burden of production shifts to the Defendants to show that House districts 21, 22, 30, 31, 38, 39, 44, and 49 in the 1992 plan were narrowly tailored to meet a compelling state interest. *See id.; Croson,* 488 U.S. at 505, 109 S.Ct. at 728; *Hunt,* 861 F.Supp. at 436.

15. The Defendants claim that compliance with section 2 of the Voting Rights Act was the compelling state interest that justified their race-based redistricting. Defs.' Post Trial Br. at 57–63.

16. The Defendants agree that in order to show that section 2 of the Voting Rights Act was a compelling state interest, they must have a strong basis in evidence that race-based redistricting was necessary as a remedial measure to comply with the Voting Rights Act. *Id.* at 59–60. Moreover, the Defendants agree that a state has a "strong basis in evidence" to conclude that it needs to engage in race-based redistricting to comply with section 2 of the Voting Rights Act when the state has information that is reasonably sufficient to lead it to conclude that the relevant minority group could make out a prima facie section 2 challenge to the existing plan. *Id.* at 59, 60, 63.

17. As we noted earlier, a plaintiff can establish a prima facie case of a violation of section 2 of the Voting Rights Act by providing evidence that satisfies the three *Gingles* preconditions: First, [the plaintiff] must show that the minority group " 'is sufficiently large and geographically compact to constitute a majority in a single-member district.' " Second, [the plaintiff] must prove that the minority group " 'is politically cohesive.' " Third, the plaintiff[ ] must establish " 'that the white majority votes sufficiently as a bloc to enable it ... usually to defeat the minority's preferred candidate.' " *Voinovich v. Quilter,* —— U.S. at ——, 113 S.Ct. at 1157 (quoting *Growe v. Emison,* 507 U.S. 25, 39, 113 S.Ct. 1075, 1084, 122 L.Ed.2d 388 (1993) (quoting *Thornburg v. Gingles,* 478 U.S. 30, 50–51, 106 S.Ct. 2752, 2766–67, 92 L.Ed.2d 25 (1986))).

18. Assuming without holding that the Defendants possessed information that would lead them to reasonably

unconstitutional and, accordingly, we find the plan to be constitutional." *Id.* 586 N.E.2d at 1022. Nevertheless, careful examination of the per curiam opinion reveals that the court was specifically addressing the constitutionality of Senate district 32 under sections 4, 9, and 11 of Article XI of the Ohio Constitution. Thus, Plaintiffs in the instant case argued before this court that the Ohio Supreme Court did not rule on the constitutionality of the challenged house districts under sections 7 and 10 of Article XI of the Ohio Constitution and that this court, accordingly, was not precluded from addressing the issue. The Defendants, however, have argued that this court is precluded from addressing the constitutionality of the reapportionment plan under the Ohio Constitution because the Ohio Supreme Court specifically stated that "the plan" was constitutional, meaning the whole plan.

conclude that a plaintiff could satisfy the first two *Gingles* factors, we hold that the Defendants did not have a "strong basis in evidence" to engage in race-based redistricting in House districts 21, 22, 30, 31, 38, 39, 44, and 49 of the 1992 plan because they did not possess information that would reasonably lead them to conclude that a plaintiff could satisfy the third *Gingles* factor in these districts—the presence of racial bloc voting.

19. Both this court and the Supreme Court previously held on the basis of all the evidence, that racially polarized voting generally did not exist in Ohio's legislative elections. The Court noted the following:

[A]ppellees [Plaintiffs in this case] have failed to demonstrate *Gingles'* third precondition—sufficient white majority bloc voting to frustrate the election of the minority group's candidate of choice. The District Court specifically found that Ohio does not suffer from "racially polarized voting." 794 F.Supp. at 700–01. Accord, App. to Juris. Statement 132a–134a, and n. 2, 139a–140a. Even appellees agree. *See* Tr. of Oral Arg. 25. Here, as in *Gingles,* "in the absence of significant white bloc voting it cannot be said that the ability of minority voters to elect their chosen representatives is inferior to that of white voters." *Gingles,* 478 U.S. at 49 n. 15, 106 S.Ct. at 2766 n. 15.

*Quilter,* 507 U.S. at 158, 113 S.Ct. at 1158; *see also Quilter,* 1992 WL 677145, at *4 & n. 2, n. 3, *8 (holding that Ohio has coalitional voting, where whites cross over and vote for black candidates, and not polarized voting, where whites vote for white candidates and blacks vote for black candidates). By relying on these precedents, we are not saying that the Apportionment Board could not take race into account unless and until it had been proven in a court that a violation of section 2 of the

Voting Rights Act had occurred. As we noted earlier, a state is not required to await a judicial finding that it has committed past or present discrimination before it voluntarily takes remedial action to eradicate the discrimination, so long as it has a "'strong basis in evidence for its conclusion that remedial action was necessary.'" *Croson,* 488 U.S. at 500, 109 S.Ct. at 725 (quoting *Wygant,* 476 U.S. at 277, 106 S.Ct. at 1848); *Miller,* —— U.S. at ——, ——, 115 S.Ct. at 2490, 2491). Our point in noting the previous rulings of this court and the Supreme Court regarding the absence of polarized voting in Ohio was to emphasize that what was readily and reasonably apparent to and held by the courts, also should have been reasonably apparent to the Defendants—racially polarized voting generally does not exist in Ohio's legislative elections.[15]

20. The Defendants contend that Tilling reasonably concluded that "racial bloc voting existed throughout Ohio." Defs.' Post Trial Br. at 62 & n. 45. Yet, the bivariate regression analysis of the Plaintiffs' expert, Dr. Henderson, for the election years 1990, 1986, and 1984, revealed the presence of coalitional voting in each of the eight districts where the Defendants, through Tilling, chose to engage in race-based redistricting in the 1992 plan. *See Quilter,* 1992 WL 677145, at *4 & n. 2. The percentage of white cross-over vote in each of those districts was as follows: Rep. Mallory—50.66%; Rep. Rankin—50.93%; Rep. Miller—44.50%; Rep. Beatty—50.25%; Rep. McLin—35.44%; Rep. Roberts—45.98%; Rep. Sykes—48.76%; Rep. Jones—44.46%. *Id.* at *4 n. 2. Prior to the time that the Defendants adopted "Amendment D," the 1992 plan, their own expert, Dr. King, analyzed over 200 elections throughout Ohio, and he concluded that a "degree of racially polarized

---

**15.** We note, however, one exception. In *Armour v. Ohio,* 775 F.Supp. 1044 (N.D.Ohio 1991), the district court held that the two House districts, 52 and 53, under the 1981 redistricting plan, which were located in Mahoning County, violated section 2 of the Voting Rights Act. The court found under a totality of the circumstances analysis that racially polarized voting existed in these two districts.

voting existed in Ohio," but he was not willing to characterize the degree of racial polarization as "legally significant." Defs.' Post Trial Br. at 63 & n. 47. Regardless of Dr. King's ability to comment on the "legal" significance of his analyses, the fact remains that Dr. King did not challenge Dr. Henderson's results on this point. *See Quilter*, 1992 WL 677145, at *4 n. 3. Dr. King's own results regarding polarized voting in Ohio revealed that on average 95% of blacks voted for black candidates and 56.7% of whites voted for black candidates, thereby confirming Dr. Henderson's results. *Id.* at *4 n. 2. In the Apportionment Board's Findings and Conclusions, the Board even admitted the presence of white cross-over voting in the minority districts where race-based remedial measures were utilized. Bd. Findings ¶ 168. Given the overwhelming statistical evidence of coalitional voting in the challenged districts under the existing plan, and given the fact that the Defendants had this information available to them before they adopted the 1992 plan, with its race-based remedial measures, we find that the Defendants

could not reasonably conclude that the relevant minority group could establish a prima facie case of a violation of section 2 of the Voting Rights Act in the eight challenged districts. Significant evidence of white majority bloc voting in these Ohio legislative districts did not exist.

21. Because the Defendants did not possess a strong basis in evidence that they needed to engage in race-based redistricting to comply with section 2 of the Voting Rights, the Act does not provide a compelling state interest to justify the remedial action.[16] *See Miller*, —— U.S. at ——, 115 S.Ct. at 2490 1995 WL 382020, at *13 ("As we suggested in *Shaw*, compliance with federal antidiscrimination law cannot justify race-based districting where the challenged district was not reasonably necessary under a constitutional reading and application of those laws."); *Hunt*, 861 F.Supp. at 440.

22. Because the Apportionment Board lacks a compelling state interest for its racial gerrymandering in House districts 21, 22, 30, 31, 38, 39, 44, and 49 of the 1992 plan,[17] we conclude that

**16.** The dissent concludes that the "State of Ohio ... has the compelling state interest of complying with the Voting Rights Act." Dissenting Op. at [1041–1042]. As support for this holding, the dissent relies on the district court's decision in *Armour v. Ohio*, 775 F.Supp. 1044 (N.D.Ohio 1991), where the court held that the two house districts, 52 and 53, located in Mahoning county under the 1981 redistricting plan violated section 2 of the Voting Rights Act, the Fifteenth Amendment to the United States Constitution, and section 7(C) of Article XI of the Ohio Constitution. The dissent implies that our instant finding that section 2 of Voting Rights Act did not constitute a compelling state interest to justify the Board's racial gerrymandering in the eight challenged House districts, is somehow inconsistent with the court's decision in *Armour*. In actuality, the two decisions present no conflict. The finding of racially polarized voting and a Voting Rights Act violation in one county of Ohio, does not necessarily mean that such evidence will be found in every county of Ohio. The House districts in Mahoning County under the 1992 plan were not even challenged in the instant case. To engage in race-based redistricting so as to remedy potential violations of section 2 of the Voting Rights Act, the Board must analyze the voting patterns

in each district under the previous plan to determine if prima facie evidence of a section 2 violation exists. If such evidence does not exist in a given district, then the Board cannot engage in race-based redistricting in that district simply because a Voting Rights Act violation previously was found in another district in a different part of the State.

**17.** In dissent, our colleague concludes that the Apportionment Board did have another compelling interest that justified its racial gerrymandering: compliance with Article XI of the Ohio Constitution, which contains Ohio's mandate to utilize traditional districting principles in the redistricting process. Dissenting Op. at [1041–1042]. Obviously, such a conclusion is based on the presumption that the Board adhered to the traditional districting principles in the Ohio Constitution when it drafted the 1992 plan. Although the dissent finds that the Board did comply with the districting principles in the Ohio Constitution, as we noted earlier the latter conclusion is a hotly contested matter, *see* Pls.' Post-Hr'g Br. at 36–49, on which we have previously chosen to abstain, *see Quilter*, 794 F.Supp. at 702. Because the Defendants, themselves, did not choose to proffer such a compelling justifica-

these districts violate the Equal Protection Clause of the Fourteenth Amendment. Based on our holding, we find it unnecessary to discuss whether the 1992 plan was narrowly tailored to further a compelling state interest.

## IV. Conclusion

The Fourteenth and Fifteenth Amendments to the United States Constitution, and the Voting Rights Act of 1965 have been major vehicles for the empowerment of black Americans long denied the full enjoyment of their political rights. Over the years, various schemes and artifices have been designed to serve as impediments to the attainment of citizenship status by minorities. As Justice Frankfurter, however, wrote for the Supreme Court in *Lane v. Wilson*, 307 U.S. 268, 275, 59 S.Ct. 872, 876, 83 L.Ed. 1281 (1939), "The [Fifteenth] Amendment nullifies sophisticated as well as simple-minded modes of discrimination." Without characterizing the nature of the discrimination present here, we simply hold that Justice Frankfurter's admonition is equally applicable to the Equal Protection Clause of the Fourteenth Amendment. Using race as the predominant factor to draw lines to concentrate black voters in discrete legislative districts with the reciprocal effect of siphoning off and reducing their influence in other districts, without legally cognizable justification, is incompatible with the Constitution, as now interpreted by the Supreme Court. Accordingly, we direct the State Defendants to redraft House districts 21, 22, 30, 31, 38, 39, 44,

---

tion for their racial gerrymandering, we again find it unnecessary to address the specific issue whether the Board complied with the traditional districting principles in the Ohio Constitution when it drafted the 1992 plan. Nevertheless, we offer two observations regarding the broader issue whether, assuming without holding that the Board did comply with the Ohio Constitution, such compliance could serve as a compelling state interest that would justify the Board's racial gerrymandering in the 1992 plan.

First, no previous court has held that a state's interest in complying with its own constitution provides a *compelling* justification to engage in racial gerrymandering. The dissent cites case law, which holds that states do have a legitimate interest in complying with the traditional districting principles embodied in their state constitutions. Dissenting Op. at [1041–1042]. No court, however, has ever held in the context of an equal protection challenge and in the face of direct evidence of racial gerrymandering that a state's interest in complying with its traditional districting principles provided compelling justification to engage in racial gerrymandering. Even the Defendants, themselves, do not make such a claim. To be sure, the Defendants argued that the Apportionment Board's compliance with Article XI of the Ohio Constitution indicated that it did not engage in racial gerrymandering and that strict scrutiny accordingly was not required. *See* Defs.' Trial Br. at 6–14, 61–64; Defs.' Post Trial Br. at 45–56. Nevertheless, even the Defendants realized that if this court determined that strict scrutiny was triggered by evidence of racial gerrymandering, the Defendants' only viable compelling interest sufficient to justify such race-based redistricting would be the Board's interest in complying with the mandates of section 2 of the Voting Rights Act. Thus, the Defendants relied solely on the Voting Rights Act as compelling justification for their race-base redistricting,

once such a condition was determined, and did not even proffer compliance with the Ohio Constitution as a compelling justification. *See* Defs.' Post Trial Br. at 56–63.

Second, the dissent's conclusion defies logical reasoning. Without reiterating the Fourteenth Amendment's aversion toward race-base classifications, suffice it to say that our earlier analysis of Supreme Court precedent revealed that a state's purposeful use of race can only survive strict scrutiny if it is remedial in nature and substantially supported by evidence of past racial discrimination. *See Reno*, 509 U.S. at ——, 113 S.Ct. at 2831 (citing *Croson*, 488 U.S. at 491–93, 109 S.Ct. at 720–21; *Wygant*, 476 U.S. at 280–82, 106 S.Ct. at 1850–51). For example, in the context of our discussion of the Voting Rights Act as a compelling state interest, we noted that compliance with Voting Rights Act could serve as a compelling justification *to engage in race-based* redistricting so long as substantial evidence was present to indicate the need for such remedial action. *See supra* part II.D. Compliance with the Voting Rights Act, which was promulgated as a remedial measure for racial discrimination in the voting context, will clearly require that the apportioning entity purposefully consider race. Obviously, compliance with the traditional districting principles in the Ohio Constitution does not qualify as such a compelling interest. The Apportionment Board did not have to purposefully consider race so as to remedy past racial discrimination in order to comply with the traditional districting principles in the Ohio Constitution. The traditional districting principles in Article XI were clearly designed with the purpose of eliminating all forms of bias from the redistricting process. *See* Ohio Const. art. XI. Thus, to conclude that the Board's-interest in complying with these principles justified their racial gerrymandering is logically unsustainable.

and 49 of the 1992 plan to comply with the aforementioned principles.

In placing reliance on this court's and the Supreme Court's holdings that racial bloc voting generally had not occurred in Ohio's legislative elections, we make no judgment as to the state of racial progress in other aspects of race relations in Ohio. The fact that black voters, however, in the various legislative districts, as shown by the record in this case, coalesce with white voters in significant enough numbers to elect candidates of their choice, who happened to be black, demonstrates a high degree of maturity. In our view, this degree of voter maturity represents the essence and ultimate objective of the Voting Rights Act and the Constitution.

IT IS SO ORDERED.

### JUDGMENT

[Filed August 11, 1995]

Because race was the predominant motivating factor in the State Apportionment Board's creation of House districts 21, 22, 30, 31, 38, 39, 44, and 49 in the 1992 reapportionment plan ("Amendment D") and because the Board lacks a compelling state interest for its racial gerrymandering, we conclude that the aforementioned House districts violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. Thus, we hereby enter judgment in favor of the Plaintiffs and order the Defendants George V. Voinovich, Stanley J. Aronoff, and Robert A. Taft II in their official capacity as members of the State Apportionment Board to redraft House districts 21, 22, 30, 31, 38, 39, 44, and 49 in the 1992 plan to comply with the principles delineated in the Opinion, filed contemporaneously with this judgment. We also order that the redrafting be completed by November 1, 1995.

Because Plaintiffs are the prevailing party in this matter, we find that they are entitled

to costs, including reasonable attorneys' fees pursuant to 42 U.S.C. §§ 1988 and 1973*l*(e).

IT IS SO ORDERED.

### SUPPLEMENTAL DISSENTING OPINION

DOWD, District Judge, dissenting.

On May 26, 1995, my colleagues vacated the majority opinion dated April 28, 1995 (Docket No. 322) and replaced it with a new majority opinion (Docket No. 327). In April, I had dissented (Docket No. 323). In May, I chose not to modify my original dissent, filing nothing in response to the "new" majority opinion which essentially added only comments on my dissent.

Now my colleagues have once again vacated their majority opinion and replaced it with an opinion that substantially changes the May 26, 1995 opinion, particularly by their deletion of the discussion relating to the "trigger" for strict scrutiny (i.e., the progeny of *Shaw v. Reno,* 509 U.S. ——, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993)), and their insertion of a discussion of the recently decided *Miller v. Johnson,* —— U.S. ——, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995).[1]

At this juncture, I remain steadfast in my decision not to vacate my dissent of April 28, 1995, notwithstanding the fact that, given all the tinkering with the majority opinion, the dissent is no longer a very good "fit" for the majority opinion. One major reason for my decision not to vacate is that the dissent has already been submitted for review before the Supreme Court of the United States, as is evidenced by its placement in the Appendix to the Jurisdictional Statement filed with that Court.[2] What I said, I said. For the most part, as I did in May, I now feel no real compulsion to "correct" my dissent in light of the subsequent majority opinion which commented on it or in light of the latest majority opinion. Astute readers will accord my dissent whatever value it has and interpret it in light of the subsequent procedural (and sub-

---

1. *Miller v. Johnson* is also found on the WESTLAW electronic database at 1995 WL 382020. The majority opinion cites to this database. For consistency, this supplementary dissent will hereafter do the same.

2. Both majority opinions have also been submitted as part of the jurisdictional statement.

stantive) posture of this case and developments in case law. I do, however, wish to set forth my view of the application of *Miller v. Johnson* to this case.[3]

## APPLICATION OF *MILLER V. JOHNSON*

In my April 28, 1995 dissent, I took the threshold position that the plaintiffs' *Shaw v. Reno* claim had no merit because the districts in question in this lawsuit, are not bizarrely shaped. *Miller v. Johnson,* however, has now made clear that "a threshold showing of bizarreness" is not required. —— U.S. ——, ——, 115 S.Ct. 2475 at 2487, 132

L.Ed.2d 762. To that extent, I must retract those portions of my dissent which discussed what I then thought was the threshold showing required for a *Shaw v. Reno* claim.

As noted by the majority, *Miller v. Johnson* clarified the burden of proof necessary to trigger strict scrutiny:

> The plaintiff's burden is to show, either through circumstantial evidence of a district's shape and demographics or more direct evidence going to legislative purpose, that race was *the predominant factor* motivating the legislature's decision to place a significant number of voters within

**3.** I also believe it is necessary to comment regarding the majority opinion's assessment of my prior discussion of the application of the Local Rules of the U.S. District Court for the Northern District of Ohio. I do so because of the importance of the latter issue to this District Court and its potential impact as this case is reviewed by the Supreme Court. Until very recently, I was the longtime Chairman of this District Court's Rules Committee. Therefore, admittedly I am in a better position than my two colleagues to know, appreciate and apply the Local Rules of this District Court. Accordingly, I make this clarifying comment.

I have always opposed the majority's decision to grant plaintiffs leave to amend their complaint *after remand* to add an Equal Protection claim under *Shaw v. Reno.* In my dissent of April 28, 1995, I articulated my reasons, one of which was rooted in certain of the Local Rules of the U.S. District Court for the Northern District of Ohio. The majority, in both its May 26, 1995 opinion and the latest opinion, asserted that the Local Rules I cited have no application. This is not so.

The majority undoubtedly recognizes that, under 28 U.S.C. § 2284, this panel sits as a district court. Therefore, the Local Rules of the Northern District of Ohio apply, despite the fact that two of the panel judges are circuit court judges.

Prior to January 1, 1992, this District Court's Local Rules provided that a subsequently-filed civil case would be deemed related to a previously-filed civil case which "involve[d] the same issue or issues of fact or grows out of the same transaction or subject matter as a pending civil suit[.]" *See* Former Local Rule 7.09(4)(c). In such circumstances that local rule *required* that the later-filed case be assigned to the judge presiding over the earlier case so long as the earlier case was still pending.

The Judges of this District Court, acting under the authority of Fed.R.Civ.P. 83, determined over time that this "related case" rule was being used by litigants and attorneys to "judge shop." Therefore, the related case rule was abolished and replaced with the present local rule pursuant to which, even if a new case appears related to

an existing case on another judge's docket, it cannot be shifted to the docket of the judge who drew the first case absent the consent of both judges. *See* Local Rules 1:2.4(2) and 6:2.5(c). Moreover, one judge cannot transfer an unrelated case on his or her docket to another judge without the approval of the Chief Judge of the District Court. *See* Local Rule 6:2.4. I first cited these local rules as part of the basis for my opposition to a post-remand amendment of the complaint.

The circuit judges making up the majority of this panel have stated in a footnote to their opinion that the rules do not apply in this instance because the plaintiffs did not file a *new lawsuit* alleging a *Shaw v. Reno* claim. The majority has missed the point. If the plaintiffs had, as they *should* have. filed a new lawsuit to assert their post-remand claim, the cited Local Rules of this District (presuming, of course, that the new case was filed in this district, as it could also have properly been filed in the Southern District of Ohio), would have operated to *prevent* them from placing their claim before this three-judge panel, a panel which they already knew was, in the majority, favorable to their viewpoint. Therefore, under the Local Rules of this District Court, the only way that the plaintiffs could assure a sympathetic ear was to obtain leave to amend the complaint.

The majority asserts that, while it may not have authority to "consider on remand the issues that the Supreme Court decided," it may "consider issues that have not been decided." There is a world of difference between considering issues that have not been previously *decided* and issues that have not been previously *raised.* The entire point is that, once a case has gone on appeal and back, if the plaintiffs have *new* claims against the defendants, they must file a new lawsuit. Failure to do so stretches Fed.R.Civ.P. 15, the remand rule, and the local rules of this District Court so far beyond their meanings as to completely destroy them. This is the ultimate in judge-shopping, the very abuse sought to be avoided by this District Court's Local Rules.

or without a particular district. To make this showing, a plaintiff must prove that the legislature *subordinated traditional race-neutral districting principles,* including but not limited to compactness, contiguity, respect for political subdivisions or communities defined by actual shared interests, *to racial considerations.* Where these or other race-neutral considerations are the basis for redistricting legislation and are not subordinated to race, a state can "defeat a claim that a district has been gerrymandered on racial lines."

at ——, 115 S.Ct. at 2487 (citations omitted and emphases added).

Despite the clarity of this expression, the majority concludes that "there remains some ambiguity regarding the *Miller* 'predominant factor' test." The specific ambiguity relates to the meaning of the word "subordinated" in the test. The majority opines that "subordinated" could mean that, as compared to racial considerations, the legislature "disregarded or abandoned" traditional districting principles or that it merely "accorded [them] less emphasis or less weight[.]" The majority concludes that both interpretations are correct.

I do not·disagree with the majority's ultimate conclusion that proof of either disregard and/or abandonment of traditional districting principles in favor of racial considerations *or* proof of diminished emphasis on traditional districting principles in favor of racial considerations is sufficient to establish a plaintiff's claim that race was the predominant factor upon which a given redistricting was based. I would only quarrel with the characterization of "the predominant factor test" as ambiguous. "Subordination" has a clear meaning:

something is subordinated when it is placed in a lower order or class, or considered as having less value or importance. This, however, is only a minor point of divergence between my view and the majority's.

I find that the defendants adhered to traditional districting principles, which happen to be also contained in the Ohio Constitution, in drawing the legislative districts in question *and* that they did not subordinate these principles to racial considerations. I would so hold notwithstanding the fact that, as I recognized in my dissent of April 28, 1995 at footnote 9, James R. Tilling's notes suggest that he purposefully considered race when drawing the districts. One can purposefully consider something without automatically subordinating all other factors also under consideration.[4] I find that the defendants considered race as they considered other factors, such as the districting principles set forth in the Ohio Constitution. Therefore, I would conclude that strict scrutiny is not required, a conclusion which would virtually end the analysis in my view.[5]

Even if strict scrutiny were required, I find for the reasons previously set forth in my April 28, 1995 dissent that the defendants had a compelling state interest. I will not repeat my analysis on this point. Suffice to say that, in my view, the defendants respected traditional districting principles while also giving race the consideration it was due in light of the Voting Rights Act and *Armour v. State of Ohio,* 775 ·F.Supp. 1044 (N.D.Ohio 1991). Balancing *all* of these considerations led to a redistricting plan narrowly tailored to meet a compelling state interest, thus withstanding strict scrutiny.

---

4. In my April 28 dissent, I declined addressing at length the majority's discussion of the "trigger" for strict scrutiny, a discussion which has been deleted in the latest majority opinion in favor of the *Miller v. Johnson* discussion. On April 28, I simply presumed, because of (1) the references to race in Tilling's notes, (2) the importance of the rights at stake, and (3) the ambiguity regarding the appropriate "trigger," that strict scrutiny should apply. Now that the Supreme Court has clarified that the "trigger" is "race-the-predominant-factor," I want to clearly state that I would not find Tilling's notes sufficient to prove that

race was *the predominant* factor considered. My present position is not inconsistent with my April 28 dissent because I simply took the view for the sake of discussion "that caution requires strict scrutiny." (April 28, 1995 Dissent, at 17). Following *Miller,* the test is clear and the need for caution on this matter is gone.

5. If strict scrutiny is not the standard of review, then rational basis applies. It would be extremely difficult, if not impossible, to conclude that the defendants had no rational basis for the district lines they drew.

The redistricting plan that is the subject of this lawsuit involves a legislature with 99 House Districts which must be configured in compliance with the Ohio Constitution. Of these 99, only eight have been challenged here. These eight discrete districts take in counties which are entitled to more than one legislator each, a fact which required the Apportionment Board to make decisions as to how to split the counties. Given the several constraints placed on the Apportionment Board, i.e., the Voting Rights Act, the Fourteenth Amendment, *Armour v. State of Ohio*, in addition to the Ohio Constitution, this Court must take to heart the admonition of the *Miller* Court that:

> [t]he distinction between being aware of racial considerations and being motivated by them may be difficult to make. This evidentiary difficulty, together with the sensitive nature of redistricting and the presumption of good faith that must be accorded legislative enactments, requires courts to exercise *extraordinary caution* in adjudicating claims that a state has drawn district lines on the basis of race.

*Miller v. Johnson*, —— U.S. —— at ——, 115 S.Ct. at 2487 (emphasis added). In my view, the majority has failed to exercise the requisite caution.

### CONCLUSION

For the reasons expressed in my April 28, 1995 dissent, as supplemented and modified herein, I respectfully dissent.

### DISSENTING OPINION

[Filed April 28, 1995]

DOWD, District Judge, dissenting.

The reapportionment of the Ohio General Assembly, required and strictly controlled by the Ohio Constitution, is done every ten years and follows the decennial census. Increases, decreases and shifts in population inevitably require that the boundary lines for the 99 seats in the House of Representatives be redrawn and, as a consequence, the boundary lines for the 33 seats in the Senate since each senate district consists of three discrete house districts.

The Apportionment Board (the Board), as established by the Ohio Constitution, consists of the Governor, the Secretary of State, the State Auditor and a single representative from each of the two major political parties in the Ohio General Assembly. Consequently, the political party that controls at least two of the three statewide offices will have majority representation on the Board.

At the time of the most recent reapportionment, for the first time in 30 years, the Republican Party, holding the offices of Governor and Secretary of State, had a majority of three on the Board. The two minority members of the Board, Auditor Ferguson and Representative Quilter together with other members of the Democratic Party commenced litigation to wrest control of Ohio's reapportionment process from the majority of the Board and place it with the federal court system. The litigation, in its fourth year, continues—even *after* two elections conducted pursuant to Amendment D adopted by the majority of the Board.

The first effort to shift the responsibility for reapportioning Ohio from the Board failed with the decision of the United States Supreme Court in *Voinovich v. Quilter*, 507 U.S. 146, 113 S.Ct. 1149, 122 L.Ed.2d 500 (1993)[1] and the subsequent decision of this

---

1. The rulings challenged before the Supreme Court were reached in several incremental steps. On January 31, 1992, a majority of this Court, addressing only the federal statutory challenge, found in favor of the plaintiffs and ordered that the Board either redraft the Plan or demonstrate that the existing Plan was remedying a Section 2 violation. *Quilter v. Voinovich*, 794 F.Supp. 695 (N.D.Ohio 1992). I dissented. Subsequently, the Board presented to the Court its justification for the creation of majority-minority districts, along with certain "technical" amendments to the Plan. The Board's Findings and Conclusions are on the record of this case at Docket No. 147,

Exhibit A. They include findings that voting in Ohio is significantly racially polarized, that there is a history of official discrimination in Ohio affecting the rights of minorities to participate in the democratic process, that there is racial bloc voting, and that minorities have experienced racial barriers to effective participation in the democratic process in Ohio. (Docket No. 147, Exh. A, ¶¶ 99–100, 107–137). These findings were simply disregarded by the majority when, on March 10, 1992, it held once again that the Plan, as amended, violated the Voting Rights Act. The Court appointed a special master to prepare a

Court in *Quilter v. Voinovich*, 857 F.Supp. 579 (N.D.Ohio 1994) responding to the Supreme Court's remand of the issue of whether the deviations in excess of 10% in the size of several districts in Ohio violated the Fourteenth Amendment.

Before this Court responded to the remand issue in March of 1994, but after the announcement of the *Voinovich* decision, and in contrast to that unanimous decision, the United States Supreme Court by a five-four vote held in *Shaw v. Reno*, 509 U.S. 630, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993) that a complaint that alleges redistricting so bizarre on its face that it is unexplainable on grounds other than race states a cause of action under the Equal Protection Clause of the Fourteenth Amendment and is not subject to a motion to dismiss. The Supreme Court majority further held that such allegations demand the same strict scrutiny under the Equal Protection Clause that is given other state laws that classify citizens by race.

Following *Shaw v. Reno*, the plaintiffs were permitted to file an amended complaint and, for the first time, raised an equal protection claim. The Court heard testimony for two days in November of 1994 and the positions of the parties have been fully briefed.

I respectfully dissent from the opinion of my colleagues as I believe judgment should be entered for the defendants on several grounds, each of which stands independently of the others. Further, my reasoning is based upon facts which I would have included in the Findings of Fact, had I written the majority opinion. These facts are attached to this dissent as Appendix A. Several of the facts are also incorporated herein.

## I. THIS THREE-JUDGE PANEL'S CONSIDERATION OF THE PLAINTIFFS' ACTION TO SET ASIDE THE REAPPORTIONMENT OF THE 99 HOUSE DISTRICTS AND 33 SENATE DISTRICTS FOR THE OHIO GENERAL ASSEMBLY WAS LIMITED TO THE SCOPE OF THE REMAND BY THE UNITED STATES SUPREME COURT AND CONSEQUENTLY THIS COURT SHOULD NOT HAVE PERMITTED THE PLAINTIFFS TO FILE A SECOND AMENDED COMPLAINT RAISING FOR THE FIRST TIME THE EQUAL PROTECTION CLAIM.

It is well established that an inferior court does not have, save in unusual circumstances, the power or authority to deviate from the mandate issued by an appellate court. *Briggs v. Pennsylvania R. Co.*, 334 U.S. 304, 306, 68 S.Ct. 1039, 1040, 92 L.Ed. 1403 (1948); *Stanton v. Stanton*, 429 U.S. 501, 502, 504, 97 S.Ct. 717, 718, 719, 50 L.Ed.2d 723 (1977).

The Supreme Court remanded this case for a single and limited purpose of determining whether the Plan's deviation from equal population among the districts violated the Fourteenth Amendment. *Voinovich v. Quilter*, 507 U.S. at 150–51, 113 S.Ct. at 1154. Upon remand, this Court decided that issue. *Quilter v. Voinovich*, 857 F.Supp. 579 (N.D.Ohio 1994). Consequently, this case should have been concluded at that point.

In granting the plaintiffs' motion for leave to file a second amended complaint, the majority of this Court reasoned that because *Shaw v. Reno* was decided after the Supreme Court issued its decision in this case, the Ohio reapportionment plan should be reevaluated. *Quilter v. Voinovich*, 157 F.R.D. 36, 40 (1994). Assuming that concept has merit,

redistricting plan. *Quilter v. Voinovich*, 794 F.Supp. 756 (N.D.Ohio 1992). Again I dissented. Later, a majority of the Court found that the Plan also violated the Fourteenth and Fifteenth Amendments to the United States Constitution. *Quilter v. Voinovich*, No. 5:91CV2219, 1992 WL 677145 (N.D.Ohio Mar. 19, 1992). In that opinion, the majority specifically found that there were "three critical facts: the absence of racial bloc voting, the fact that black voters have been able to elect both black and white candidates of

their choice, and the fact that such candidates have been elected over a sustained period of time." *Id.* at \*2. The Supreme Court never directly addressed these particular findings of the majority, other than to note them. *See, Voinovich v. Quilter*, 507 U.S. at 150–51, 113 S.Ct. at 1154. I, however, adhere to my original view that the defendants did properly justify a need to create majority-minority districts. *Quilter v. Voinovich*, 794 F.Supp. at 758 (Dowd, J., dissenting).

such review required a new lawsuit and a new draw, with a probable different three-judge panel.[2]

I dissented when my colleagues granted the plaintiffs the right to file a Second Amended Complaint to raise for the first time, post remand, an Equal Protection Claim. I continue to hold that it was an abuse of discretion to grant that motion and that this case should have been considered closed once the Court determined the issue remanded by the Supreme Court. Thus I would rule that the motion to allow the Second Amended Complaint was improvidently granted. I would revisit the motion, deny it and close the case.

## II. THE EQUAL PROTECTION CLAIM IN A LEGISLATIVE REAPPORTIONMENT CASE IS CONSTRAINED BY THE NARROW LIMITS OF THE MAJORITY OPINION IN *SHAW V. RENO* AND AN EXAMINATION OF THE REAPPORTIONED BOUNDARY LINES OF THE HOUSE AND SENATE DISTRICTS IN OHIO DEMONSTRATES CONCLUSIVELY THAT THEY CANNOT BE EXPLAINED ON THE BASIS OF RACE ALONE.

The Supreme Court has interpreted the "one person, one vote" principle to protect the collective rights of citizens to vote as a cohesive unit. *See Shaw v. Reno,* 509 U.S. ——, ——, 113 S.Ct. 2816, 2823, 125 L.Ed.2d 511 (1993) (citing *Allen v. State Bd. of Elections,* 393 U.S. 544, 569, 89 S.Ct. 817, 833, 22 L.Ed.2d 1 (1969)). As an outgrowth of the freedom of association in Article I, § 2 of the United States Constitution, the "one person, one vote" principle protects that cherished freedom to associate with others of like views, backgrounds or beliefs when bringing a united voice to the ballot box. Yet "equal protection" of the right to vote does not limit itself to the very public process of association through coalitional voting. "Equal protection" of voting rights if it means anything must protect the rights of the individual as well. *Harper v. Virginia Board of Elections,* 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966) (state's conditioning of the right to vote on the payment of poll tax violates the Equal Protection Clause of the Fourteenth Amendment). *See also Gomillion v. Lightfoot,* 364 U.S. 339, 349, 81 S.Ct. 125, 131, 5 L.Ed.2d 110 (1960) (redistricting of Tuskegee Alabama constituted an unlawful segregation of races of citizens in violation of the Equal Protection Clause of the Fourteenth Amendment) (Whittaker, J., concurring), *approved by Shaw v. Reno,* 509 U.S. at —— ——, 113 S.Ct. at 2825–26; *Wright v. Rockefeller,* 376 U.S. 52, 84 S.Ct. 603, 11 L.Ed.2d 512 (1964) (Fourteenth and Fifteenth Amendment challenge to racial gerrymandering of a congressional district stated a constitutional claim, although plaintiffs failed to meet their burden of proof at trial), *interpreted by Shaw v. Reno,* 509 U.S. at ——, 113 S.Ct. at 2826.

Congress through the enactment of the Voting Rights Act has emphasized judicial protection of coalitional voting rights. As a result, courts have been quick to recognize that coalitional concepts such as vote dilution should be recognized as part and parcel of Fourteenth Amendment equal protection doctrine. Discussions of minority voting strength, racial bloc voting, cohesiveness, etc. became reflections of this aspect of equal protection. But these discussions of the coalitional protections guaranteed by the Four-

---

**2.** This district court has gone to great lengths in the past five years to avoid any opportunity for lawyers to select the judge they wish to have adjudicate their lawsuit. The related case rule has been abolished and, consequently, even if a new case appears related to an existing case on another judge's docket, it cannot be shifted to the docket of the judge who drew the first case absent the consent of both judges. *See,* Local Rules 1:2.4(2) and 6:2.5(c). Moreover, one judge cannot transfer an unrelated case on his or her docket to another judge without the approval of the Chief Judge of the district. *See,* Local Rule 6:2.4. Consequently, had "new law suit" been filed challenging the reapportionment based on *Shaw v. Reno,* it could have been filed in either the Northern or Southern District of Ohio and it would have been assigned to a judge of that district. The provisions of 28 U.S.C. § 2284 would then have been invoked and the Chief Judge of the Circuit would have had the opportunity to determine anew which judges he wished to assign to the case. However, a majority of this Court, presumably unaware of or, as Circuit Judges, completely indifferent to the impact of the Court's Local Rules, elected to use their assignment to this three-judge panel to give the plaintiffs another bite at the apple.

teenth Amendment have at times overshadowed that aspect of the Amendment which guarantees the individual's voting rights. Courts faced with disparate precedent on the constitutional aspects of voting rights law have struggled to apply that law to particular cases. To a large extent those efforts have been successful. In part this may be due to the fact that as far as plaintiffs were concerned the rights of the individual and the rights of the group were not at odds. The equal protection concerns of the individual and the group to which that individual associated himself or herself were the same. This all changed with *Shaw v. Reno,* 509 U.S. ——, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993).

In *Shaw v. Reno,* individuals, who did not associate themselves with the group whose voting rights the state sought to protect, invoked the Fourteenth Amendment to invalidate the state's efforts to protect the coalitional voting rights of those others. The Court did not prohibit the state from acting to protect the coalitional voting rights guaranteed by equal protection. Instead it held that the state could not act to protect those coalitional voting principles by creating a voter eligibility classification—in this case by creating a classification through the use of the district system—"so irrational on its face that it can be understood only as an effort to segregate voters ... because of their race...." 509 U.S. at ——, 113 S.Ct. at 2832. By striking the balance between individual and coalitional Fourteenth Amendment rights in this way, the Court defined the limits of a Fourteenth Amendment claim based on individual guarantees to equal protection. That the holding of *Shaw v. Reno* was limited to Fourteenth Amendment challenges to "bizarre" or "irrational" districts stems from the Court's recognition of the individual right at issue: the right not to be segregated on the basis of race into bizarre or irrational districts when the state acts to protect the coalitional voting rights of others.

The nature of the individual right addressed by *Shaw v. Reno* is easily understood. At law, the "district" system can be

understood as a type of voter eligibility classification theoretically indistinguishable from a poll tax, literacy test or residency requirement. *Compare Guinn v. United States,* 238 U.S. 347, 35 S.Ct. 926, 59 L.Ed. 1340 (1915) (state use of literacy test and grandfather clause to determine one's eligibility to vote violates the Fifteenth Amendment). Each of these attributes—payment of the tax, the ability to read and write, or geographic domicile—constitutes a characteristic without which a vote cannot be cast. Likewise, in elections for representatives in a multimember legislative body, a voter who must vote under a district voting system cannot cast a ballot for the candidate or his or her choice if that candidate happens to be running in another district. Without the characteristic of residing within the district, a voter cannot cast a ballot. This is not the case in an at-large voting system. To the contrary, in an at-large system an otherwise qualified voter can cast a ballot for whatever candidates or slate of candidates choose to vie for a seat in the legislature, with only the top vote-getters being seated.[3] By enacting a district system instead of an at-large system, the state favors locality-based elections over ones which emphasize the majority interests of the larger political geography. In a district system it might make sense for representatives to "bring home the bacon" as it were, while in an at-large system the interests of the overarching majority predominate. Thus, this locality-based voter eligibility classification expressed by the district system is an attribute of the law for which individual voters deserve equal protection. If the state acts to deprive an individual of equal protection of this law, then a remedy may be had through the Fourteenth Amendment.

As is the case of other voter eligibility classifications, however, the mere fact that the state selects one classification over another does not give rise to an equal protection claim. The mere process of districting classifies voters. But that classification alone creates no constitutional violation. Moreover, the individual citizen *vis a vis* other individuals has no general right to be drawn

---

**3.** Of course where an election is held for a single political office such as with elections for a president, governor, mayor, or county executive, the

district system and the at-large system are one in the same.

into one district or to be drawn out of another. As long as the citizen is included in one district that is enough. Citizens as a group, however, do have a coalitional equal protection right to have certain of their associational interests protected in the line-drawing process. Thus, in general, the coalitional interests of the group predominate over the individual's interests and the state may engage in districting that recognizes those group interests. The difficulty comes with the realization that when the state drafts a district boundary to protect the coalitional interests of a group, the state simultaneously selects a voting classification for the individual based on that group interest. The line is drawn and the voter is classified. *Shaw v. Reno* stands for the proposition that where the line drawn is "so irrational on its face that it can be understood only as an effort to segregate voters ... because of their race ...," 509 U.S. at ——, 113 S.Ct. at 2832 then the state has crossed the line separating the proper from the improper state recognition of coalitional voting rights. In such a case the individual's equal protection right not to be subject to a voter eligibility classification designed to segregate the individual into a district based on race predominates over the state's legitimate interest in protecting the coalitional voting rights of others.

The Court in *Shaw v. Reno* defined the line that separates the permissible from the impermissible state recognition of coalitional voting rights with its quotation of the opinion of Justice White, joined by Justices Stevens and Rehnquist, in *United Jewish Organizations v. Carey*, 430 U.S. 144, 168, 97 S.Ct. 996, 1011, 51 L.Ed.2d 229 (1977):

"[W]e think it ... permissible for a State, *employing sound districting principles such as compactness and population equality,* to attempt to prevent racial minorities from being repeatedly outvoted by creating districts that will afford fair representation to the members of those racial groups who are sufficiently numerous *and whose residential patterns afford the opportunity* of creating districts in which they will be in the majority."

*Shaw v. Reno*, 509 U.S. at ——, 113 S.Ct. at 2829 (quoting *UJO*, 430 U.S. at 168, 97 S.Ct. at 1011) (emphasis added).[4] This opinion of Justice White in *UJO* as endorsed by the majority in *Shaw v. Reno* defines the nature of a Fourteenth Amendment individual voting rights equal protection claim. Voting district classifications which group voters on the basis of race while adhering to the traditional districting principles announced by Justice White in *UJO* must be challenged if at all based on the vote "dilution" principles embodied in such cases as *Rogers v. Lodge*, 458 U.S. 613, 102 S.Ct. 3272, 73 L.Ed.2d 1012 (1982) (at large election challenged under the Fourteenth and Fifteenth Amendments) and *Reynolds v. Sims*, 377 U.S. 533, 555 & n. 29, 84 S.Ct. 1362, 1378 & n. 29, 12 L.Ed.2d 506 (1964) (district reapportionment challenged under the Fourteenth Amendment).[5] When the state makes voting district classifications which do not adhere to traditional districting principles, then the use of districting by the state to protect coalitional interests by segregating voters on the basis of race states a claim for a prima facie violation of the Fourteenth Amendment. However, as demonstrated by the evidence in this case viewed in the light most favorable to the plaintiffs, such

---

4. *Cf. also Karcher v. Daggett,* 462 U.S. 725, 740–44, 103 S.Ct. 2653, 2663–65, 77 L.Ed.2d 133 (1982) (acknowledging that the state may vary from "one person, one vote" principles for "[a]ny number of consistently applied [nondiscriminatory] legislative policies ... [including] making districts compact, respecting municipal boundaries, preserving the cores of prior districts, and avoiding contests between incumbent Representatives," and implicitly acknowledging that "preserving the voting strength of racial minority groups" might be one of those policies); *Metro Broadcasting, Inc. v. FCC,* 497 U.S. 547, 583–84, 110 S.Ct. 2997, 3018–19, 111 L.Ed.2d 445 (1990) (minorities have particular viewpoints worthy of protection in the effective exercise of their electoral franchise such that neither the

Fourteenth nor the Fifteenth Amendments mandate any *per se* rule against using racial factors in districting and apportionment).

5. The Court expresses no opinion on whether failure to abide by these traditional districting principles when creating voter eligibility qualifications on bases other than race states a claim under the Fourteenth Amendment. *See generally Harper v. Virginia Bd. of Elections,* 383 U.S. 663, 666, 86 S.Ct. 1079, 1081, 16 L.Ed.2d 169 (1966) ("Our cases demonstrate that the Equal Protection Clause of the Fourteenth Amendment restrains the States from fixing voter qualifications which invidiously discriminate.").

is not the case here. Consequently, the Court's reliance on *Shaw v. Reno* is misplaced.

The plaintiffs' claim that the reapportionment of the eight challenged house districts [6] constitutes racial gerrymandering under *Shaw v. Reno* is devoid of proof. Once again, it is helpful to recall the advice of Bernard Grofman, a national expert on apportionment issues as they relate to minority interests: "One approach to eliminating or reducing gerrymandering is through statutory or state constitutional provisions that strictly implement formal criteria such as compactness, equal population, and maintenance of the integrity of political subunits." *Quilter v. Voinovich*, 794 F.Supp. 695, 704 (Dowd, J., dissenting).

The Ohio constitutional provisions mirror Grofman's advice. Moreover, the apportioning of Ohio has produced a system whereby blacks are successful in electing members of their race to the Ohio General Assembly in impressive numbers.

The plaintiffs' claim that the 1991 reapportionment of Ohio constitutes racial gerrymandering fails at the outset because the plaintiffs are unable to point to any house district in Ohio where the boundaries of the district can be explained solely on the basis of race. The only such attempt, i.e., to describe a district as "bizarrely drawn," was made by the plaintiffs' sole witness. Dr. Gordon Henderson pointed to the northwest portion of House District 38 as constituting a "moose head" or a "hand with two fingers showing." Henderson contended that the division of House Districts 38 and 39 with the so-called "moose head" was not explainable by the Ohio Constitution but was done to pick a significant number of black voters and put them in District 38. In fact, and as demonstrated by the defendants and not contested, the "moose head" followed the boundary lines of the City of Dayton as required by the Ohio Constitution.

In my view, Amendment D, as it relates to the eight challenged districts before the Court, reflects adherence to traditional districting principles of compactness, contiguity and respect for the integrity of political subdivisions inherent in Article XI of the Ohio Constitution. Given the major population shifts which occurred during the last decade in the State of Ohio, most of the districts established in 1981 could not be retained under Article XI, § 7(D). Further, the requirements of Article XI, §§ 8, 9 and 10 take precedence over those of § 7(D) and preclude the retention of most of the 1981 districts.

It is also my view that the eight challenged districts are not "extremely irregular," "highly irregular," "so irrational" or "bizarre" as to be only attributable to race-based line-drawing for the purpose of segregating the races. Rather, they are regularly drawn, compact, contiguous and geographically cohesive as required by Article XI of the Ohio Constitution.

Since "irregularity" is a somewhat subjective matter, I find that even if one were to find irregularity in the boundaries of those districts, it can be explained with reference to the boundaries of political subdivisions, in conjunction with the populations of those various subdivisions. The split of certain communities results from the fact that these communities exist geographically in nonconti-

---

6. Although the majority opinion accepts the plaintiffs' assertion that they are challenging the entire Plan, not just these eight districts I find that the Second Amended Complaint cannot reasonably be read to challenge any more than the eight specified districts. Paragraph 56 of the Second Amended Complaint alleges that "[t]he districts which have been modified solely on the basis of race *include* House Districts 31, 30, 22, 21, 38, 39, 44 and 49." (emphasis added). Plaintiffs take the position that these eight districts are merely illustrative of the racially gerrymandered districts. However, if the entire Plan were really being challenged, there would be no need to state that the Plan "included" these districts. It is a given that the Plan includes *all* of the House Districts, these eight as well as those not specified. Furthermore, ¶ 55 of the Second Amended Complaint, which alleges that the defendants have drawn irregular districts "in numerous places throughout the state," further supports the interpretation that only certain districts are being challenged, not the entire Plan. Notwithstanding plaintiffs' present position, I would find that the Second Amended Complaint states a *Shaw v. Reno* claim only as regards the eight specified districts.

guous sections. In addition, in some instances, changes in the ward and precinct boundaries, coupled with changes in population, contribute to what some might judge to be "unusual" district boundaries.

Although there may have been other constitutionally-permissible ways of drawing these districts, the Board, by drawing them as it did, has not engaged in racial gerrymandering and has not violated the Equal Protection Clause of the United States Constitution.

Given the narrow construction and limited application of *Shaw v. Reno*, combined with absence of any demonstrable evidence that the boundaries of the House Districts are so bizarre as to be explainable on the basis of race alone, the defendants are entitled to judgment on the plaintiffs' Equal Protection Claim because of a failure of proof on the part of the plaintiffs.[7]

## III. THE PROOF OFFERED IN SUPPORT OF THE SECOND AMENDED COMPLAINT IS IN REALITY A THINLY DISGUISED ATTEMPT TO REVISIT THE DILUTION ISSUE ALREADY ADVERSELY DECIDED TO THE PLAINTIFFS BY THE SUPREME COURT'S DECISION.

As indicated in the brief submitted by the Justice Department, the plaintiffs' Second Amended Complaint presents a *Shaw v. Reno* claim "in only the most cursory manner." Moreover, as predicted by the Justice Department, the plaintiffs offered precious little evidence that the challenged house districts were so irregular that they were explainable solely in racial terms. To the contrary, and in keeping with the mandates of the Ohio Constitution, the legislative districts look quite regular and compact. In contrast to a *Shaw v. Reno* claim, which was offered as the basis for granting the motion to file the Second Amended Complaint, the testimony offered is a thinly disguised attempt to renew the dilution claim by offering it in a *Shaw* garment.

The Second Amended Complaint focused on eight House Districts for being so irregular as to be explained on race alone. The eight districts, as configured by Amendment D, are composed as follows, with the first number being the percentage of black population in each district and the second number being the percentage of black voting age population in that district:

1) House District 21 (Franklin County)— 54.30% and 48.30%.

2) House District 22 (Franklin County)— 44.68% and 40.98%.

3) House District 30 (Hamilton)—55.98% and 52.72%.

4) House District 31 (Hamilton)—49.16% and 43.13%.

5) House District 38 (Montgomery)— 44.47% and 41.56%.

6) House District 39 (Montgomery)— 40.69% and 36.71%.

7) House District 44 (Summit)—43.07% and 39.86%.

8) House District 49 (Lucas)—49.99% and 46.42%.

In only one of the challenged districts is there a majority of black voters. There is nothing in the challenged districts which remotely approaches the political apartheid fear which appears to be the motivating factor in *Shaw v. Reno*, 509 U.S. at ——, 113 S.Ct. at 2827. In reality, the plaintiffs seek an expansion of *Shaw v. Reno* to include any reapportionment plan that is race-conscious and, in so doing, to expand the realm of judicial supervision to every reapportionment plan. Here, the plaintiffs wish to apportion the black voters not to insure the election of additional candidates of choice for blacks, as is the motive behind much of the Voting Rights litigation, but to have the black voters distributed in such a fashion that they will have maximum voting power. That is a dilution claim rather than a *Shaw v. Reno* claim. I dissent for the additional reason that the majority's opinion constitutes a renewed attempt to reapportion to maximize black voting power, a remedy rejected by the Supreme Court in this case.

7. The Court solicited an amicus brief from the Justice Department and that brief, in a more scholarly fashion than this dissent, arrives at the same conclusion.

## IV. ASSUMING ARGUENDO THAT PLAINTIFFS HAVE ESTABLISHED A PRIMA FACIE CASE OF AN EQUAL PROTECTION VIOLATION, THE PROOF OFFERED BY THE DEFENDANTS IN SUPPORT OF AMENDMENT D ENTITLES THE DEFENDANTS TO JUDGMENT UNDER A STRICT SCRUTINY EVALUATION.

As my colleagues in the majority have concluded, under Equal Protection jurisprudence a reapportionment plan that classifies citizens on the basis of race, even though not explicitly, requires strict scrutiny; that is, the plan can be upheld only if it is narrowly tailored to further a compelling state interest. *Shaw v. Reno*, 509 U.S. at ——, 113 S.Ct. at 2825. The Supreme Court made clear that even if a racial gerrymander is done for the "benign" purpose of enhancing minority voting strength, it must be reviewed with strict scrutiny. *Shaw v. Reno*, 509 U.S. at ——, 113 S.Ct. at 2830.

The Supreme Court, however, did not identify the threshold level of racial consideration that is necessary before a redistricting plan is characterized as a racial gerrymander subject to strict scrutiny. The Court defined "racial gerrymandering" in redistricting as "the deliberate and arbitrary distortion of district boundaries ... for [racial] purposes." *Shaw v. Reno*, 509 U.S. at ——, 113 S.Ct. at 2823 (quoting *Davis v. Bandemer*, 478 U.S. 109, 164, 106 S.Ct. 2797, 2826, 92 L.Ed.2d 85 (1986) (Powell, J., concurring in part and dissenting in part)). That definitions seems not particularly enlightening in view of the apparent conflict of meaning between "deliberate" and "arbitrary" actions. The majority has devoted a considerable amount of time trying to find in *Shaw*'s progeny an answer to the "trigger" question.[8] However, since fundamental rights are at stake here (i.e., voting rights and equal rights), I simply take the view that caution requires strict scrutiny.[9]

The eight challenged districts will withstand strict scrutiny if they were drawn to meet a compelling state interest and if they were narrowly tailored to accomplish that goal. The State of Ohio has a compelling interest in complying with Article XI of its Constitution,[10] requiring compact and contiguous districts which respect boundaries of political subdivisions. *See, Reynolds v. Sims*, 377 U.S. 533, 578, 84 S.Ct. 1362, 1390, 12 L.Ed.2d 506 (1964), cited in *Shaw v. Reno*, 509 U.S. at ——, 113 S.Ct. at 2826, for the proposition that interests such as these are legitimate. *See also, Wright v. Rockefeller*, 376 U.S. 52, 84 S.Ct. 603, 11 L.Ed.2d 512 (1964) (where racial groups are highly concentrated in certain communities, districts which likewise concentrate those racial

---

8. As the majority opinion has acknowledged, the *Shaw v. Reno* Court discussed the fact that, in the redistricting context, it is not mere race "consciousness" or "awareness" which triggers strict scrutiny. This is true because, when drawing district lines, the legislature is always aware of race, as well as other factors such as age, religion, economic status, and politician persuasion. The Supreme Court's position is consistent with the long-recognized distinction between race-conscious, as opposed to race-based, decisions. *See, e.g., Personnel Admin. of Mass. v. Feeney*, 442 U.S. 256, 279, 99 S.Ct. 2282, 2291, 60 L.Ed.2d 870 (1979) (" 'Discriminatory purpose' ... implies more than intent as volition or intent as awareness of consequences" but rather implies "action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group.").

As discussed at some length in the majority opinion, different courts since *Shaw v. Reno* have adopted different triggering tests. *See, e.g., Johnson v. Miller*, 864 F.Supp. 1354, 1372 (S.D.Ga.

1994), *probable jurisdiction noted*, —— U.S. ——, 115 S.Ct. 713, 130 L.Ed.2d 620 (1995) (race the "substantial or motivating consideration"); *DeWitt v. Wilson*, 856 F.Supp. 1409, 1413 (E.D.Cal. 1994), *petition for cert. filed*, 63 U.S.L.W. 3127 (U.S. Aug. 8, 1994) (No. 94–275) (race "the sole criteria [sic]"); *Shaw v. Hunt*, 861 F.Supp. 408, 431 (E.D.N.C.1994), *petition for cert. filed*, 63 U.S.L.W. 3439 (U.S. Nov. 21, 1994) (Nos. 94–923, 94–924) (" 'race-a-motivating-factor' triggering test").

9. The notes of James R. Tilling strongly suggest that he purposefully considered race when he drew the house district boundaries reflected in Amendment D and challenged here. Since citizens were, at least in certain parts of the State, classified by race, the eight challenged districts arguably must be subjected to strict scrutiny.

10. There is no argument advanced that Article XI is facially in violation of the Equal Protection Clause. The plaintiffs have not challenged the constitutionality of Article XI.

groups may reflect wholly legitimate purposes).

The State of Ohio also has the compelling state interest of complying with the Voting Rights Act.[11] As a matter of fact, at the time of the reapportionment under scrutiny here, the case of *Armour v. State of Ohio,* 775 F.Supp. 1044 (N.D.Ohio 1991) had just made that clear. *Armour* was a challenge brought by black voters, after the 1981 reapportionment, claiming that the line drawn between two districts in Mahoning County split and diluted black voting strength in that community. *Armour* found that there *was* a history of discrimination against blacks such that blacks were deprived of an opportunity for effective participation in the democratic process. *Id.,* at 1058–59. The court further found that there was racial bloc voting and that blacks were unable to elect candidates of their choice. *Id.* The *Armour* decision was issued on September 4, 1991, a mere month before the 1991 Reapportionment Plan was due. For that reason, the court did not order that the districts be redrawn. However, it did retain jurisdiction to see what would happen with the districts in the 1991 Plan.

The defendants here were without a doubt aware of the *Armour* decision which *required* the Board to consider race when drawing lines. In a strange twist, the defendants having done what they were effectively ordered to do by the *Armour* court, the majority now levels a charge of "race motivation." It seems there is no way to win and no clear guidance for persons in the defendants' position.

## V. REMEDY.

The opinion of my colleagues declares that the apportionment of black voters in the eight legislative districts in Hamilton, Franklin, Montgomery, Summit and Lucas Counties is unconstitutional in the context of the Equal Protection Clause of the Fourteenth Amendment. However, the opinion fails to

declare the contours of the remedy. Also, absent a remedial order, it would appear that there is no definitive judicial action from which the defendants could appeal. Assuming that the majority has not chosen to engage in rendering an advisory opinion, it would seem that the public officials charged with running the next election scheduled for 1996, the voters, and the potential candidates for the next election to the General Assembly, should be given some guidance on what happens next.[12] In addition, guidance is needed to reconcile the majority opinion with *Armour.* For example, under the teaching of *Armour,* it was acceptable to put 35% of the black voting age population into one district rather than split the blacks into two districts having 11% and 24% blacks, respectively. In *Armour,* that percentage of black voters was not considered packing and, in fact, was required to avoid minority vote dilution. In the instant case, where House District 39 in Montgomery County contains 36.71% black voting age population, the majority calls that impermissible "packing."

Presumably, the majority will eventually enter a Rule 54 final judgment and that judgment will undoubtedly delineate in considerable detail exactly what relief the plaintiffs are awarded. I also presume that the judgment entry will provide some guidance regarding deadlines and time lines in view of the upcoming primary and general elections. I reserve the right to comment on any such judgment after it is entered.

## VI. CONCLUSION.

In summary, I respectfully dissent for the following reasons:

1. A majority of this Court erred in granting the plaintiffs' motion to file a Second Amended Complaint which action was contrary to and in excess of the narrow limits of the remand from the Supreme Court.

---

11. *See, United Jewish Organizations, Inc. v. Carey,* 430 U.S. 144, 161–168, 97 S.Ct. 996, 1007–1011, 51 L.Ed.2d 229 (1977) (plurality opinion); *id.* at 179–180, 97 S.Ct. at 1017 (Stewart, J., concurring in the judgment).

12. Since the 1996 Ohio Primary Election has been moved up to March 19, 1996, partisan candidates must declare their candidacy by no later than January 19, 1996. This time line could easily be put in jeopardy.

2. The majority's expansive interpretation of the narrow teachings of *Shaw v. Reno*, if unchallenged, effectively converts the reapportionment process as mandated by the Ohio Constitution into a judicial exercise with no guidelines for the unprecedented exercise of federal judicial power.

3. In the event the opinion in *Shaw v. Reno* does provide, as my colleagues contend, that the state violates the Equal Protection Clause where race is a substantial and motivating factor in drawing boundary lines for reapportionment processes, the plaintiffs nevertheless have failed to prove that the race-conscious concerns of the majority members of the Ohio Reapportionment Board constituted a substantial and motivating factor in the drawing of the boundary lines for the eight challenged districts.

4. In the event the opinion in *Shaw v. Reno* does allow for, as my colleagues contend, the requirement that the state must demonstrate a compelling interest in the reapportionment of a legislative district where it is found that race was a substantial and motivating factor in the drawing of the boundary lines of the challenged district, I find that the state has demonstrated such a compelling interest, i.e., compliance with the Voting Rights Act and the provisions of the Ohio Constitution which deal with reapportionment.

5. The decision of the majority fails to establish, for the purpose of guidance, what constitutes "dilution" as opposed to "packing" in the distribution of black voters into districts in highly urbanized counties in Ohio consistent with the reapportionment mandates of the Ohio Constitution.

6. The majority opinion of the Court is devoid of guidelines to direct state officials in the reapportionment process so as to, on the one hand, avoid offending the Voting Rights Act as interpreted by the decision in *Armour v. State of Ohio* and, on the other hand, avoid offending the Equal Protection Clause of the Fourteenth Amendment given the pronouncements of the majority in this case which reject that "bizarrely-drawn lines" are a condition of proof to an equal protection claim.

## APPENDIX A

### FINDINGS OF FACT

1. The 1991 Apportionment Board (the Board) consisted of defendants, Governor George V. Voinovich, Secretary of State Robert A. Taft, Jr., and Ohio Senate President Stanley J. Aronoff, and two of the plaintiffs, Auditor of State Thomas E. Ferguson and Speaker Pro Tempore of the Ohio House of Representatives Barney Quilter. (Report of James R. Tilling, p. 2) (Tilling Report).[a]

2. On August 22, 1991, the Board appointed defendant James R. Tilling (Tilling), the then Chief Executive Officer of the Ohio Senate, as its Secretary. (Tilling Report, p. 2).[b]

3. Tilling has a Bachelor of Science degree in Social Sciences from Clarkson University and a Masters Degree in Political Science from the University of Illinois, with a major in urban and metropolitan politics; in addition, he has completed course work toward a doctorate. He is a former professor of political science at Ohio University where he taught from 1969–1976. (Tilling Report, pp. 2–3). During the four years prior to the convening of the Board, Tilling served on the Task Force of the National Conference of State Legislators (NCSL), a bipartisan group of legislators, legislative staff, and members of other interested groups from all fifty states. (Transcript of Proceedings, November 17, 1994, Docket No. 312 [TR–2], p. 197; Tilling Report, p. 3).

4. Voinovich, Taft, and Aronoff directed Tilling to draft and submit an apportionment plan which complied with the Ohio Constitution, the United States Constitution, and the Voting Rights Act, 42 U.S.C. § 1973, *et seq.* (TR–2, pp. 207–208). Pursuant to this authority, Tilling drafted the 1991 Apportionment Plan, including Amendment D. (Tilling Report, p. 2).

---

a. A copy of the Tilling Report is found at Defendants' Supplemental Exhibits, Vol. I, Exhibit A.

b. Tilling was not himself a member of the Board. (Transcript of Proceedings, November 17, 1994, p. 274).

5. Tilling testified that by the Fall of 1990 he had developed a good understanding of the legal issues involved in re-districting and had become sensitized to those issues. (TR–2, p. 198). Among those issues was concern for the Fourteenth and Fifteenth Amendments to the United States Constitution, the Voting Rights Act and Ohio's constitutional requirements. (TR–2, p. 199).

6. Tilling testified that, in the course of his work on the NCSL Task Force, it was made clear to him by various groups representing minorities that the current interpretation of the Voting Rights Act was that, first, there should be no attempt to dilute minority voting strength and, second, every opportunity should be taken to increase minority voting strength. (TR–2, p. 201).

7. Article XI of the Ohio Constitution (Article XI or Art. XI) dictates the basic method for apportioning the State of Ohio for members of the General Assembly.[c]

8. The method for apportionment found in Article XI includes a framework not only for an orderly succession for apportionment (Art. XI, § 10), but also for principles of population equality (Art. XI, § 3), compactness, contiguity and geographical cohesion (Art. XI, § 7(A)), and respect for the boundaries of political subdivisions and communities of interest (Art. XI, §§ 7(B), 7(C), 8, 9 and 10).

9. The first requirement in the constitutionally-defined apportionment process is to determine the ideal population for a district by dividing the State's population by 99, the number of house seats. (Art. XI, § 2). In 1991, using the most recent federal decennial census information, that ideal mathematical number was 109,567. (Tilling Report, ¶ 6).

10. The Ohio Constitution specifies that the population of any house district cannot be less than 95% nor more than 105% of the ideal population number. (Art. XI, § 3). In

1991, that range in population was from 104,-089 to 115,045. (Transcript of Proceedings, November 16, 1994 [TR–1], p. 78) (Docket No. 311).

11. The Ohio Constitution also requires that if a county, or part of a county, is not large enough to meet the population requirement of Section 3, the district must be formed by combining governmental units, giving preference in the following order: counties, townships, municipalities, and city wards. (Art. XI, § 7(B)).

12. Where a county or political subdivision is too large to comply with the Section 3 population requirement, the Ohio Constitution requires that the excess population be split off along geographical lines, giving preference in order as follows: township, city ward, city, and village. Where division is necessary, only one unit may be divided between two districts. (Art. XI, § 7(C)).

13. Article XI, § 10 provides the sequence for creating and numbering house districts. The first step is to designate the counties which are either mandatorily or permissively entitled to be constituted as single member districts. (Art. XI, §§ 10(A) and 10(B)). In 1991, four counties (Allen, Warren, Columbiana and Wood) were in the mandatory category and three counties (Ashtabula, Fairfield and Wayne) were in the permissive category. (Tilling Report, ¶¶ 12, 13). The majority of the Apportionment Board elected to designate Fairfield, Wayne and Ashtabula as single member districts.

14. The next step is to create districts out of whole counties, beginning with the county having the largest population, where obviously more than one house district will be allocated, and fixing the boundaries for the appropriate number of house districts. In this process, the remaining territory in any county must be combined with adjoining territory outside the county before proceeding to combine the remaining territory of the state into representative districts.[d] (Art. XI, § 10(C)).

---

c. A true and correct copy of Article XI of the Ohio Constitution is found at Defendants' Supplemental Exhibits, Vol. I, Exhibit G. (Joint Stip., Docket No. 305, ¶ 4).

d. For example, Cuyahoga County, the most populous county, is entitled to 12.88 districts. *Quil-*

*ter v. Voinovich,* 794 F.Supp. 695, 705 (N.D.Ohio 1992). Twelve of those districts must be contained wholly within Cuyahoga County and the thirteenth district will, of necessity, spill over into an adjoining county. Selecting a portion of the county for "spill-over" is governed by Article XI, § 7(C).

After the apportionment is completed for the most populous county, then the process moves to the next most populous county and continues in that fashion until all counties entitled to more than a single district have been accommodated. In Ohio, which has 88 counties, a substantial majority of the house districts are contained in the 26 most populous counties. House Districts 8 through 81 were created in this manner. (Tilling Report, ¶ 14).

15. Once the process has been completed with respect to counties entitled to more than one district, the apportionment of the remainder of the State is accomplished by following the provisions of Article XI, Section 10(D). Under this provision, the 62 counties which had a 1990 population number less than 90% of the ideal number of 109,567 were combined with other counties to create House Districts 82 through 99. (Tilling Report, ¶ 16).

16. Amendment D, also referred to as the 1992 Plan, is the currently effective version of the Apportionment Plan. Amendment D was effective during the 1992 and 1994 Ohio elections. (Joint Stip., Docket No. 305, ¶ 3).[e]

17. The Ohio Supreme Court has previously held that the Plan complies with the requirements of Article XI. *Voinovich v. Ferguson*, 63 Ohio St.3d 198, 586 N.E.2d 1020 (1992).[f]

18. Between 1980 and 1990, the total population of Ohio remained virtually the same, with the State gaining only 50,000 people.

However, there were significant population shifts within the State; specifically, there was a shift from the Northeast quadrant to the Central and Southwest portions, particularly to Franklin, Delaware, Union and Madison Counties. There also occurred a shift from Cincinnati and Hamilton County to Butler, Clermont and Warren Counties. Cuyahoga County lost one entire house district in population (109,000 people), while Franklin County gained one entire house district. Franklin County replaced Hamilton County as the second most populous county of the State. There were also significant population shifts from the inner cities to the suburbs, as well as changes in municipal corporation, ward and precinct boundaries.[g] (Tilling Report, ¶ 42–43).

19. In Ohio, significant minority populations are concentrated in the major urban counties. These populations are geographically compact and contiguous. (Tilling Report, ¶ 61, 65).[h]

20. The plaintiffs have leveled a challenge against the formation of House Districts 21, 22, 30, 31, 38, 39, 44 and 49.[i] All of these districts are located in Ohio's major urban counties. (Tilling Report, ¶ 63).

21. Handwritten notes made by Tilling in the process of drafting Amendment C to the 1991 Plan reflect his step by step thought process in the line drawing. (Tilling Notes).[j]

22. Plaintiffs have challenged House Districts 21 and 22 in Franklin County.[k]

23. As regards H.D. 21, Tilling's notes indicate that he would first "draw minority

---

e. The original 1991 Apportionment Plan, as amended by Amendment C, has not been used in any election and is no longer the current plan.

f. A copy of this opinion is found at Defendants' Supplemental Exhibits, Vol. I, Exhibit D.

g. Several counties experienced significant changes in wards, for example: Franklin County went from 58 wards to 74; Lucas County went from 24 wards to 23; and Summit County ward boundaries were changed dramatically. (Tilling Report, ¶ 51).

h. Maps showing the 1990 census concentration of voting-age blacks in each of the counties where districts are challenged are found at Defendants' Supplemental Exhibits, Vol. I, Exhibit

T (Franklin County, Districts 21 and 22); Exhibit V (Hamilton County, Districts 30 and 31); Exhibit X (Montgomery County, Districts 38 and 39); Exhibit Z (Summit County, District 44); and Exhibit BB (Lucas County, District 49).

i. *See*, note 4, in the dissenting opinion.

j. A copy of the notes is found at Plaintiffs' Prior Proceeding Trial Exhibits, Vol. 2 of 4, Exhibit 120.

k. A map of the Franklin County House Districts, including District 21 and District 22, is found at Defendants' Supplemental Exhibits, Vol. I, Exhibit U. A map showing the political subdivision boundaries is found in the same Volume at Exhibit II.

districts" and that he would "avoid primarily white Bexley and Whitehall." (Tilling Notes on H.D. 21).

24. As configured in Amendment D, H.D. 21 contains a population of 108,859 consisting of the following political subdivisions:

Franklin County, OH
02 Columbus City—
 Fifty-sixth Ward—
 Twenty-third Ward—
 25096023A Precinct A
 25096023B Precinct B
 25096023E Precinct E
 25096023G Precinct G
 25096023H Precinct H
 Twenty-fifth Ward—
 Twelfth Ward—
 Thirteenth Ward—
 Sixteenth Ward—
 Seventeenth Ward—
 Twenty-sixth Ward—
 Forty-first Ward—
 Sixth Ward—
 Seventh Ward—
 Eighth Ward—
15 Clinton Township—
 (No Wards)
 25M020B121531 Clinton B
21 Mifflin Township—

(Defendants' Supplemental Exhibits, Vol. I, Exhibit C).

25. As H.D. 21 is configured in Amendment D, blacks are 54.30% of the total population. The black voting age population of H.D. 21 is 48.30%. (Defendants' Supplemental Exhibits, Vol. I, Exhibit DD).

26. H.D. 21 is bordered by H.D. 26 and H.D. 27 on the north, H.D. 23 on the west, H.D. 22 on the south, and H.D. 25 on the north and east.

27. The boundaries of H.D. 21 are partially coterminous with the boundaries of the City of Columbus, which boundaries resulted from irregular annexation.[1] Clinton Township, part of which is in H.D. 21, consists of geographically non-contiguous sections. (TR–2, p. 225, 229–230; Tilling Report, ¶ 37c; Plaintiffs' Exhibit 1; Defendants' Supplemental Exhibit MM (Docket No. 319)). Ward 23, part of which is in H.D. 21, also

consists of non-contiguous sections. (Tilling Report, ¶ 37c; Plaintiffs' Exhibit 1, Defendants' Supplemental Exhibit MM).

28. In the November 3, 1992 general election, conducted under Amendment D, a black Democrat prevailed in H.D. 21, there being no challenger. (Defendants' Supplemental Exhibits, Vol. I, Exhibits GG and JJ).

29. In the November 8, 1994 general election, conducted under Amendment D, a black Democrat prevailed in H.D. 21 over a white candidate. (Defendants' Supplemental Exhibits, Vol. I., Exhibits KK and LL).

30. As regards H.D. 22, Tilling's notes indicate that he would "create as close to a majority-minority district as possible" and "avoid Bexley and Whitehall, which are mostly white areas." (Tilling Notes on H.D. 22).

31. As configured in Amendment D, H.D. 22 contains a population of 110,848 consisting of the following political subdivisions:

Franklin County, OH
02 Columbus City—
 First Ward—
 Second Ward—
 Thirty-fifth Ward—
 Third Ward—
 Fourth Ward—
 Fiftieth Ward—
 Fifty-first Ward—
 Fifty-fifth Ward—
 Fifth Ward—
 Twenty-seventh Ward—
 25096027A Precinct A
 25096027B Precinct B
 25096027C Precinct C
 25096027F Precinct F
 25096027G Precinct G
 25096027H Precinct H
 25096027I Precinct I
 25096027J Precinct J
 25096027K Precinct K
 25096027M Precinct M
 Twenty-eighth Ward—
 Forty-fourth Ward—
 Forty-seventh Ward—
 Forty-eighth Ward—
 Madison Township, Precinct 0—
 Portion on the inside of I–270

---

1. Tilling pointed out that what, to an outsider, might appear to be an "unusual" boundary is actually the result of Franklin county's having been "subjected to rampant annexations for at least the last 20 years." (TR–2, p. 225).

(Defendants' Supplemental Exhibits, Vol. I, Exhibit C).

32. As H.D. 22 is configured in Amendment D, blacks are 44.68% of the total population. The black voting age population of H.D. 22 is 40.98%. (Defendants' Supplemental Exhibits, Vol. I, Exhibit DD).

33. H.D. 22 is bordered by H.D. 21 on the north, H.D. 23 on the south and west, H.D. 24 on the south and east, and H.D. 25 on the north and east.

34. Madison Township,[m] part of which is in H.D. 22, consists of geographically non-contiguous sections. (TR–2, p. 232; Tilling Report, ¶ 37c; Plaintiffs' Exhibit 1, Defendants' Supplemental Exhibit MM).

35. In the November 3, 1992 general election, conducted under Amendment D, a black Democrat prevailed in H.D. 22 over a white candidate. (Defendants' Supplemental Exhibits, Vol. I, Exhibits GG and JJ).

36. In the November 8, 1994 general election, conducted under Amendment D, a black Democrat prevailed in H.D. 22 over another black candidate and a white candidate. (Defendants' Supplemental Exhibits, Vol. I., Exhibits KK and LL).

37. Plaintiffs have challenged House Districts 30 and 31 in Hamilton County.[n]

38. As regards H.D. 30, Tilling's notes indicate that he would "start[ ] with majority-minority districts" and "includ[e] the greatest portion of the eastern segment of black population." (Tilling Notes on H.D. 30).

39. As configured in Amendment D, H.D. 30 contains a population of 108,885 consisting of the following political subdivisions:

Hamilton County, OH
03 Cincinnati City—
Thirteenth Ward—
Fifteenth Ward—
Seventh Ward—
Fourteenth Ward—
Second Ward—
3108652A Precinct A
3108652B Precinct B
3108652C Precinct C
3108652D Precinct D
3108652E Precinct E
3108652F Precinct F
3108652G Precinct G
3108652H Precinct H
3108652I Precinct I
3108652L Precinct L
3108652M Precinct M
3108652P Precinct P
3108652R Precinct R
3108652T Precinct T
3108652U Precinct U
3108652V Precinct V
3108652W Precinct W
Third Ward—
15 St. Bernard City—
24 Columbia Township—
(No Wards)
31M020B Precinct B
31M020C Precinct C
31M020D Precinct D
31M020E Precinct E
27 Elmwood Township—
30 Golf Manor Township—
39 Springfield Township—
(No Wards)
31M075DD Precinct DD

(Defendants' Supplemental Exhibits, Vol. I, Exhibit C).

40. As H.D. 30 is configured in Amendment D, blacks are 55.98% of the total population. The black voting age population of H.D. 30 is 52.72%. (Defendants' Supplemental Exhibits, Vol. I, Exhibit DD).

41. H.D. 30 is bordered by H.D. 36 on the north and east, H.D. 31 and H.D. 21 on the west, and H.D. 37 on the south.

42. In H.D. 30, Columbia and Springfield Townships both consist of geographically

m. Plaintiffs' expert, Dr. Gordon Henderson, criticized this District for containing only one precinct of *Hamilton* Township. However, it appears to me that this is an error and that Henderson intended to refer to the split of Madison Township. (TR–2, pp. 129–130).

n. A map of the Hamilton County House Districts, including District 30 and District 31, is found at Defendants' Supplemental Exhibits, Vol. I, Exhibit W. A map showing the political subdivision boundaries is found in the same Volume as Exhibit II.

non-contiguous sections. (TR–2, p. 235; Tilling Report ¶ 37d; Plaintiffs' Exhibits 6 and 7; Defendants' Supplemental Exhibit NN).

43. In the November 3, 1992 general election, conducted under Amendment D, a black Democrat prevailed in H.D. 30 over two white candidates. (Defendants' Supplemental Exhibits, Vol. I, Exhibits GG and JJ).

44. In the November 8, 1994 general election, conducted under Amendment D, a black Democrat prevailed in H.D. 30 over another black candidate. (Defendants' Supplemental Exhibits, Vol. I., Exhibits KK and LL).

45. As regards H.D. 31, Tilling's notes indicate that he would "draw [a] second majority-minority district, using areas of black population." (Tilling Notes on H.D. 30).

46. As configured in Amendment D, H.D. 31 contains a population of 105,573 consisting of the following political subdivisions:

Hamilton County, OH
03 Cincinnati City—
 Twenty-third Ward—
 Twenty-second Ward—
 Tenth Ward—
 Eleventh Ward—
 Twelfth Ward—
 Sixteenth Ward—
 Seventeenth Ward—
 Eighteenth Ward—
 Sixth Ward—
 Eighth Ward—
 Ninth Ward—
39 Springfield Township—
 (No Wards)
 31M075L Precinct L

(Defendants' Supplemental Exhibits, Vol. I, Exhibit C).

47. As H.D. 31 is configured in Amendment D, blacks are 49.16% of the total population. The black voting age population of H.D. 31 is 43.13%. (Defendants' Supplemental Exhibits, Vol. I, Exhibit DD).

48. H.D. 31 is bordered by H.D. 35 on the north, H.D. 33 and H.D. 34 on the west, and H.D. 30, H.D. 32, and H.D. 37 on the east.

49. Springfield Township, partially in H.D. 31, consists of geographically non-contiguous sections. (TR–2, p. 234–235; Plaintiffs' Exhibits 6 and 7; Defendants' Supplemental Exhibit NN).

50. In the November 3, 1992 general election, conducted under Amendment D, a black Democrat prevailed in H.D. 31 over two white candidates. (Defendants' Supplemental Exhibits, Vol. I, Exhibits GG and JJ).

51. In the November 8, 1994 general election, conducted under Amendment D, a black Democrat prevailed in H.D. 31 over another black candidate and a white candidate. (Defendants' Supplemental Exhibits, Vol. I., Exhibits KK and LL).

52. Plaintiffs have challenged House Districts 38 and 39 in Montgomery County.[o]

53. As regards H.D. 38, Tilling's notes state that he would create a "majority-minority district[.]" (Tilling Notes on H.D. 38).

54. As configured in Amendment D, H.D. 38 contains a population of 106,899 consisting of the following political subdivisions:

Montgomery County, OH
02 Dayton City—
 Tenth Ward—
 Eleventh Ward—
 First Ward—
 Fifth Ward—
 5711105A Precinct A
 5711105B Precinct B
 5711105D Precinct D
 5711105F Precinct F
 5711105G Precinct G
 5711105I Precinct I
 Sixth Ward—
 Seventh Ward—
 Eighth Ward—
 Twelfth Ward—
 Thirteenth Ward—
 Fourteenth Ward—
 Fifteenth Ward—
 57111015A Precinct A
 57111015B Precinct B
 57111015C Precinct C
 57111015D Precinct D
 57111015E Precinct E
 57111015F Precinct F
 57111015G Precinct G
 57111015H030537 Precinct H
 57111015H030636 Precinct H
 57111015I030636 Precinct I
 Nineteenth Ward—
 Twentieth Ward—
18 Jefferson Township

---

o. A map of the Montgomery County House Districts, including District 38 and District 39, is found at Defendants' Supplemental Exhibits, Vol. I, Exhibit Y. A map showing the political subdivision boundaries is found in the same Volume at Exhibit II.

(Defendants' Supplemental Exhibits, Vol. I, Exhibit C).

55. As H.D. 38 is configured in Amendment D, blacks are 44.47% of the total population. The black voting age population of H.D. 38 is 41.56%. (Defendants' Supplemental Exhibits, Vol. I, Exhibit DD).

56. H.D. 38 is bordered by H.D. 39 on the north and east, H.D. 40 on the west, H.D. 41 on the south, and H.D. 42 on the east.

57. In H.D. 38, the boundary lines are partially coterminous with the municipal boundaries of the City of Dayton. (TR–2, p. 238; Tilling Report, ¶ 37e; Plaintiffs' Exhibit 2).

58. In the November 3, 1992 general election, conducted under Amendment D, a black Democrat prevailed in H.D. 38 over a white candidate. (Defendants' Supplemental Exhibits, Vol. I, Exhibits GG and JJ).

59. In the November 8, 1994 general election, conducted under Amendment D, a black Democrat prevailed in H.D. 38 over another black candidate and a white candidate. (Defendants' Supplemental Exhibits, Vol. I., Exhibits KK and LL).

60. As regards H.D. 39, Tilling's notes state that he would "create an influence district with the highest possible minority vote" and that he would "[t]ake in Madison [Township], Trotwood, [and] portions of Harrison [Township]." (Tilling Notes on H.D. 39)).

61. As configured in Amendment D, H.D. 39 contains a population of 107,079 consisting of the following political subdivisions:

Montgomery County, OH
02 Dayton City—
Third Ward—
5711103A Precinct A
5711103B0303539 Precinct B
5711103C Precinct C
5711103D Precinct D
5711103E Precinct E

5711103F030540 Precinct F
5711103F030639 Precinct F
5711103G Precinct G
5711103H Precinct H
5711103I Precinct I
5711103J Precinct J
5711103K Precinct K
5711103L Precinct L
5711103M Precinct M
5711103N030540 Precinct N
5711103N030639 Precinct N
5711103O Precinct O
5711103P Precinct P
Fifteenth Ward—
571110151030537 Precinct I
Sixteenth Ward—
Seventeenth Ward—
Eighteenth Ward—
Twenty-first Ward—
Twenty-second Ward—
Fourth Ward—
Fifth Ward—
5711105C Precinct C
5711105E Precinct E
5711105H Precinct H
10 Trotwood City—
19 Madison Township—
20 Mad River Township—
(No Wards)
57M045B Precinct B
57M045E Precinct E
57M045F Precinct F
57M045K Precinct K
57M045S Precinct S
57M045T Precinct T
57M045U Precinct U
57M045W Precinct W
Harrison Township, Precinct C—
Only the non-contiguous portion to East

(Defendants' Supplemental Exhibits, Vol. I, Exhibit C).

62. As H.D. 39 is configured in Amendment D, blacks are 40.69% of the total population. The black voting age population of H.D. 39 is 36.71%. (Defendants' Supplemental Exhibits, Vol. I, Exhibit DD).

63. H.D. 39 is bordered by H.D. 43 on the north, H.D. 40 on the north and west, and H.D. 38 and H.D. 42 on the south.

64. Some wards in H.D. 39 exist as non-contiguous portions of the City of Dayton. (TR–2, pp. 239–240; Tilling Report ¶ 37e; Plaintiffs' Exhibit 2).

65. In the November 3, 1992 general election, conducted under Amendment D, a black Democrat prevailed in H.D. 39 over another black candidate. (Defendants' Supplemental Exhibits, Vol. I, Exhibits GG and JJ).

66. In the November 8, 1994 general election, conducted under Amendment D, a black Democrat prevailed in H.D. 39 over a white candidate. (Defendants' Supplemental Exhibits, Vol. I, Exhibits KK and LL).

67. Plaintiffs have challenged House District 44 in Summit County.[p]

68. As regards H.D. 44, Tilling's notes indicate that he would "try to maximize the minority voters in [Representative Vernon Sykes'] district," including the "city of Akron, Wards 2, 3, 5 and parts of 1, 4, and 10." (Tilling Notes on H.D. 44).

69. As configured in Amendment D, H.D. 44 contains a population of 104,538 consisting of the following political subdivisions:

Summit County, OH
01 Akron City—
 Tenth Ward—
 First Ward—
 7700351A Precinct A
 7700351B Precinct B
 7700351C Precinct C
 7700351D Precinct D
 7700351E Precinct E
 7700351G Precinct G
 7700351H Precinct H
 7700351I Precinct I
 7700351L Precinct L
 7700351M Precinct M
 7700351O Precinct O
 7700351P42 Precinct P
 7700351P44 Precinct P
 7700351Q Precinct Q
 7700351R Precinct R
 7700351S Precinct S
 7700351T Precinct T
 7700351U Precinct U
 7700351V Precinct V
 7700351W Precinct W
 7700351X Precinct X
 7700351Y42 Precinct Y
 7700351Y44 Precinct Y
 Second Ward—
 Third Ward—
 Fourth Ward—

(Defendants' Supplemental Exhibits, Vol. I, Exhibit C).

70. As H.D. 44 is configured in Amendment D, blacks are 43.07% of the total population. The black voting age population of H.D. 44 is 39.86%. (Defendants' Supplemental Exhibits, Vol. I, Exhibit DD).

71. H.D. 44 is bordered by H.D. 46 on the north, H.D. 45 on the west, H.D. 47 on the south, and H.D. 48 on the east.

72. In the November 3, 1992 general election, conducted under Amendment D, a black Democrat prevailed in H.D. 44 over a white candidate. (Defendants' Supplemental Exhibits, Vol. I, Exhibits GG and JJ).

73. In the November 8, 1994 general election, conducted under Amendment D, a black Democrat prevailed in H.D. 44 over a white candidate. (Defendants' Supplemental Exhibits, Vol. I., Exhibits KK and LL).

74. Plaintiffs have challenged House District 49 in Lucas County.[q]

75. As regards H.D. 49, Tilling's notes state that he would "[d]raw minority district first, based upon minority population distribution display" and that he would "follow[ ] the black population concentration to Ward 6 [and] ... then ... add Hispanic voters." (Tilling Notes on H.D. 49).

---

p. A map of the Summit County House Districts, including District 44, is found at Defendants' Supplemental Exhibits, Vol. I, Exhibit AA. A map showing the political subdivision boundaries is found in the same Volume at Exhibit II.

q. A map of the Lucas County House Districts, including District 49, is found at Defendants' Supplemental Exhibits, Vol. I, Exhibit CC. A map showing the political subdivision boundaries is found in the same Volume at Exhibit II.

76. As configured in Amendment D, H.D. 49 contains a population of 105,798 consisting of the following political subdivisions:

Lucas County, OH
04 Toledo City—
 Second Ward—
 4842652K Precinct K
 4842652L Precinct L
 Fourth Ward—
 Sixth Ward—
 Tenth Ward—
 Eighth Ward—
 Thirteenth Ward—
 Fourteenth Ward—
 Seventeenth Ward—

(Defendants' Supplemental Exhibits, Vol. I, Exhibit C).

77. As H.D. 49 is configured in Amendment D, blacks are 49.99% of the total population. The black voting age population of H.D. 49 is 46.42%. (Defendants' Supplemental Exhibits, Vol. I, Exhibit DD).

78. H.D. 49 is bordered by H.D. 50 on the north and east, and H.D. 52 on the south and west.

79. In the November 3, 1992 general election, conducted under Amendment D, a black Democrat prevailed in H.D. 49 over a white candidate. (Defendants' Supplemental Exhibits, Vol. I, Exhibits KK and LL).

80. In the November 8, 1994 general election, conducted under Amendment D, a black Democrat prevailed in H.D. 49 over another black candidate. (Defendants' Supplemental Exhibits, Vol. I., Exhibits KK and LL).

81. Given the percentage of black population in the eight challenged districts, i.e., 54.30% (H.D. 21), 44.68% (H.D. 22), 55.98% (H.D. 30), 49.16% (H.D. 31), 44.47% (H.D. 38), 40.69% (H.D. 39), 43.07% (H.D. 44), and 49.99% (H.D. 49), the average percentage of black population in those districts is 47.79%. (Defendants' Supplemental Exhibits, Vol. I, Exhibit DD).

82. Given the percentage of black voting age population in the eight challenged districts, i.e., 48.30% (H.D. 21), 40.98% (H.D. 22), 52.72% (H.D. 30), 43.13% (H.D. 31), 41.56% (H.D. 38), 36.71% (H.D. 39), 39.86% (H.D. 44), and 46.42% (H.D. 49), the average percentage of black voting age population in those districts is 43.71%. (Defendants' Supplemental Exhibits, Vol. I, Exhibit DD).

83. There was one more minority representative and one more minority senator elected in 1992 under Amendment D than had last been elected under the 1981 Apportionment Plan, for a total of fifteen, as compared to thirteen, minority legislators. (TR–2, p. 256).

84. In the 1994 election, the same number of minority representatives was elected plus one additional senator, for a total of sixteen minority legislators. (TR–2, p. 260).